[Nos. 10319–9–I; 10401–2–I; Division One. May 7, 1984.]
10405–5–I; 10761–5–I.

THE STATE OF WASHINGTON, *Respondent,* v. MICHAEL
M. BOCKMAN, ET AL, *Appellants.*

476

*Raymond H. Thoenig* and *James E. Sedney* of *Washington Appellate Defender Association, Berkey & Kooistra,* and *Brad Kooistra,* for appellants (appointed counsel for appeal).

*Norm Maleng, Prosecuting Attorney,* and *Lee D. Yates, James M. Roe,* and *Barbara Corey–Boulet, Deputies,* for respondent.

SWANSON, J.—Michael Bockman appeals convictions of second degree burglary, simple assault, and first degree murder. Timothy Bockman appeals convictions of second

degree burglary, third degree assault, and first degree murder. The Bockmans' appeals have been consolidated.

Preliminarily, a summary of the procedural background of this appeal is necessary. This court heard oral argument in January of 1983 and filed an opinion on June 13, 1983. In July, the Bockmans moved for reconsideration, primarily on the issue of whether the trial court erred by permitting the jury to separate during deliberations. In light of our Supreme Court's opinion on the issue in *State v. Smalls*, 99 Wn.2d 755, 665 P.2d 384 (1983), we granted the Bockmans' motion for reconsideration. We heard additional oral argument, and on November 9, 1983, we withdrew the filed opinion and ordered a stay pending a remand to the trial court for the purpose of determining whether the jurors had been prejudiced by their separation. On February 7, 1984, we received the trial court's findings and conclusions after a hearing on that issue.

With the procedural background summarized, we proceed with the relevant facts. In the early morning hours of October 18, 1980, two police officers were summoned to a burglarized dentist's office in the 2200 block of North 56th Street in Seattle. One of the officers testified that his dog tracked a scent from the dental office to the Bockman residence. The officer was joined at the residence by a second officer. The officers stated that they had observed two people looking out the window of the residence as the officers approached the door. A person, later identified as Michael Bockman, apparently opened the door while two other persons, later identified as Timothy Bockman and Ray Kirkham, remained inside. The suspects allegedly told the officers that they had been home all evening. The officers testified that they observed the cuffs, shoes, and socks of the three persons to be damp. One officer stated that he viewed inside the house a green jacket similar to the one allegedly worn by one of the burglars. One of the officers testified that Timothy Bockman, Michael Bockman, and Ray Kirkham were brought out onto the porch, where a citizen witness in the burglary investigation identified them

as the persons he saw near the dentist's office. The officers attempted to effect an arrest. An altercation ensued but Timothy and Michael Bockman and Ray Kirkham were all taken into custody. Christian Bockman, Timothy's and Michael's brother, testified that after his brothers were in custody he disposed of items his brothers had taken from the dentist's office.

On the day of the Bockmans' arrest, police discovered the murdered body of Anna Lauricella in the bedroom of her home located near the dentist's office and the Bockman residence. She had been stabbed repeatedly.

On November 21, 1980, the Bockman brothers were both charged with murder in the first degree and burglary in the second degree. On December 5, 1980, Ray Kirkham was also charged with murder in the first degree and burglary in the second degree. On December 31, 1980, the prosecution's motion was granted to dismiss without prejudice the first degree murder count against the Bockman brothers. The prosecution made the motion to dismiss because Kirkham was not available as a witness against the Bockman brothers and without his testimony the prosecution believed there was not sufficient evidence to convict the Bockman brothers of murder. The State amended the information by charging both Bockmans with third degree assault arising out of the arrest on the burglary charges. Michael Bockman was found guilty by a jury of burglary in the second degree and simple assault; Timothy Bockman was convicted of burglary in the second degree and assault in the third degree.

On February 4, 1981, several days after the conclusion of the burglary and assault trial, the Bockman brothers were again charged with first degree murder of Mrs. Lauricella. The defendants' joint trial before a jury on the murder charge commenced on March 23, 1981. Ray Kirkham was the State's primary witness.[1] He testified that he visited the Bockman residence the night of the burglary and mur-

---

[1]Kirkham had entered a plea of guilty to second degree murder.

der and went with the two brothers down 54th Avenue toward Greenlake. He stated that they stopped in an alley behind what was later identified as the residence of Mrs. Lauricella. Michael Bockman then climbed onto the roof of the house and cut the power line to the house. Michael and Timothy entered the residence and a television set and other items were removed. Kirkham stated that he fled to the Bockman residence when he heard a scream in the Lauricella home. Kirkham also testified that when the Bockman brothers returned to their home, Timothy Bockman had bloodstains all over a pair of gloves, and Timothy said that they had to hurt someone. Kirkham quoted Timothy Bockman as saying that Mike tried to keep her quiet and he [Tim] finished her off. Kirkham also testified that he had observed a bayonet in Michael Bockman's back pocket, and that after the Bockmans returned from the Lauricella residence, they burglarized the dentist's office.

The jury found both Timothy and Michael Bockman guilty of first degree (felony) murder, and this appeal from the convictions in both trials followed.

### ALLEGED ERRORS IN ASSAULT/BURGLARY TRIAL

The Bockmans claim that the trial court erred by not suppressing statements made to police at the time of the initial police contact on the porch.

The police officers were led to the Bockman residence by a tracking dog. Michael Bockman opened the door while Timothy Bockman and Ray Kirkham remained inside. Appellants claim that the police should have given *Miranda* warnings before asking questions; since no *Miranda* warnings were given, appellants reason that their prearrest statements should have been suppressed.

Appellants do not indicate where in the record an objection was made to the admission of statements made to police prior to the giving of *Miranda* warnings.[2] However, it appears from an examination of the record that the

---

[2] A statement of the facts or argument in a brief should contain references to relevant facts of the record. RAP 10.3(a)(4), (5).

statements to police were made in the course of an investigatory stop. The trial court correctly found the police did not have probable cause to arrest prior to the identification by the witness. To justify a stop short of an arrest, an officer must have "a reasonable suspicion, based on objective facts, that the individual is involved in criminal activity." *Brown v. Texas*, 443 U.S. 47, 51, 61 L. Ed. 2d 357, 99 S. Ct. 2637 (1979); *see State v. Gluck*, 83 Wn.2d 424, 518 P.2d 703 (1974). Appellants do not contend that the police officers lacked a well founded suspicion for stopping and talking to the Bockmans. For an investigatory stop to be reasonable, and thus constitutionally permissible, upon less than probable cause, the stop is limited as to length, movement of the suspect, and the investigative techniques employed. What an officer learns is significant; if the officer's questions are dispelled, the suspect must be released. An officer may ask a suspect to identify himself and explain his activities. *State v. Gluck, supra.* The investigatory stop in the case at bench was proper. *See State v. Walker,* 24 Wn. App. 823, 604 P.2d 514 (1979) (detention in a police car for 8 minutes so victim could arrive and identify suspect held proper).

Timothy Bockman contends that the trial court erred in failing to find he was illegally arrested. We find no error.

The police officers approached the Bockman residence after a tracking dog had circled the residence several times. The officers observed several people looking out of the residence window. A person, later identified as Michael Bockman, was said to have opened the door while two other persons, later identified as Timothy Bockman and Ray Kirkham, stood behind Michael inside the residence. The suspects allegedly told the officers that they had been home all evening. The officers testified that they observed the cuffs, shoes, and socks of the three persons to be damp. One of the officers stated that he observed a green jacket inside the residence. A witness in the burglary investigation had stated that one of the suspects was wearing a green jacket. One of the officers testified that he detained the three men

and brought them out onto the front porch. The citizen witness in the burglary investigation was transported to the scene and made an identification. The officers then arrested the suspects.

In a motion to suppress evidence seized at the time of the arrest, the trial court ruled that the arrest on the front porch was permissible. The trial court found that *Payton v. New York,* 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371 (1980) was not applicable "where the officers were properly present and while present obtained probable cause for an arrest;" that officers were "in an investigative posture;" that the officers did not have probable cause to arrest prior to the identification by the witness; that prior to the arrest the "situation was basically consensual;" and that the showup identification used was in accordance with *State v. Kraus,* 21 Wn. App. 388, 584 P.2d 946 (1978)—namely it was within minutes after the crime was committed and in the course of a prompt search for the suspect.

■■ The front porch of the home was a public place for arrest purposes where, once probable cause was established, the officers could properly make an arrest. *United States v. Santana,* 427 U.S. 38, 49 L. Ed. 2d 300, 96 S. Ct. 2406 (1976). Michael Bockman's subsequent retreat into the house cannot defeat the proper arrest which has "been set in motion in a public place". *United States v. Fleming,* 677 F.2d 602, 608 (7th Cir. 1982).

Timothy Bockman claims the identification procedure was impermissibly suggestive and created a substantial likelihood of misidentification. He cites a number of factors to support his contention: that the witness knew he was going to see a person the police had tracked from the crime scene, that the suspects were all crowded together on the front porch, and that lights were directed at the suspects from the car in which the witness sat.

■ Evidence of an identification should be excluded only if the identification procedure was so impermissibly suggestive as to create a very substantial likelihood of irreparable misidentification. *E.g., Neil v. Biggers,* 409 U.S.

188, 196, 34 L. Ed. 2d 401, 93 S. Ct. 375 (1972); *State v. Cook,* 31 Wn. App. 165, 171, 639 P.2d 863 (1982). The "totality of the circumstances" must be examined to determine if the procedure created a likelihood of irreparable misidentification. *Manson v. Brathwaite,* 432 U.S. 98, 113–14, 53 L. Ed. 2d 140, 97 S. Ct. 2243 (1977). "[R]eliability is the linchpin in determining the admissibility of identification testimony . . ." *Manson v. Brathwaite, supra* at 114. The courts have specified five factors to determine whether an identification was reliable: (1) the witness' opportunity to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty of the identification; and (5) the length of time between the crime and the confrontation. *E.g., Neil v. Biggers, supra* at 199–200; *State v. Cook, supra* at 172. Additionally, the United States Supreme Court has recognized that juries can intelligently measure the weight of questionable identification testimony. *See Manson v. Brathwaite, supra* at 116; *Simmons v. United States,* 390 U.S. 377, 384, 19 L. Ed. 2d 1247, 88 S. Ct. 967 (1968).

Under the totality of the circumstances, the identification procedure here was sufficiently reliable. About the time of the burglary, the witness saw the Bockmans from about 10 feet. The record implies the witness was attentive at the time of the crime and at the showup. At the showup the witness saw the suspects from a reasonable distance. The porch on which the Bockmans stood was well lighted. From the record, it appears the witness was confident as to the accuracy of his identification. Only a short time elapsed between the crime and the initial identification.

Finally, it is important to note that a prompt identification procedure frequently demonstrates good police procedure. A prompt identification procedure best guarantees freedom for innocent suspects. *See Stovall v. Denno,* 388 U.S. 293, 302, 18 L. Ed. 2d 1199, 87 S. Ct. 1967 (1967). Under the totality of the circumstances, the identification procedure was proper. The trial court did not err in deny-

ing defendant's motion to suppress the identification evidence.

Timothy Bockman requested the following instruction about dog tracking evidence:

> Evidence of tracking by bloodhounds or other trained dogs should be subjected to careful examination in the light of other evidence in the case, and should be acted upon with great caution. You should not find the defendant guilty upon such evidence alone.

He claims the trial court's refusal to give the proposed instruction was error.

We note that only Timothy Bockman requested the cautionary instruction on dog tracking evidence. Because Michael Bockman did not propose the instruction or present an objection to the trial court's failure to give the instruction, we need not address the issue related to his appeal; however, the rationale for rejecting the claim of error by Timothy Bockman applies equally to Michael.

Subsequent to the instant trial, our court held that it was error not to give an instruction identical to the instruction requested here. *State v. Wagner,* 36 Wn. App. 286, 673 P.2d 638 (1983). Thus, the trial court's failure to give the limiting instruction here constituted error. The lack of a limiting instruction on the weight of dog tracking evidence, however, is subject to a constitutional harmless error analysis. *People v. McRaft,* 102 Mich. App. 204, 301 N.W.2d 852 (1981).

■ To find an error harmless under the constitutional test, it must be found harmless beyond a reasonable doubt. *State v. Jones,* 101 Wn.2d 113, 125, 677 P.2d 131 (1984). The court in *Jones* recognized that it is still unsettled which constitutional harmless error test is appropriate, the "contribution test" or the "overwhelming evidence test". *Jones,* at 125.

Even applying the stricter contribution test, we are convinced beyond a reasonable doubt that the failure to give the jury the cautionary instruction was harmless. It is obvious that failure to give the cautionary instruction did not

contribute to the assault conviction because the dog tracking evidence was not probative of the assault. We are also convinced beyond a reasonable doubt that failure to give the cautionary instruction did not affect the burglary conviction. We note that even with a cautionary instruction, the jury is permitted to consider the dog tracking evidence in conjunction with the other evidence. It follows that generally where abundant evidence corroborates dog tracking evidence, failure to provide the instruction is of minor significance. Further, particularly in this case, the contribution of the dog tracking evidence pales to insignificance when viewed in light of the other evidence.[3] In sum, then, the court's failure to instruct the jury that dog tracking evidence alone was insufficient to find Timothy Bockman guilty was harmless error.

The Bockmans claim the court did not properly instruct the jury as to the meaning of reasonable doubt. Instruction 2, about which the Bockman brothers complain, is essentially WPIC 4.01. The instruction is without infirmity and has been approved by the Washington Supreme Court. *See State v. Cox,* 94 Wn.2d 170, 615 P.2d 465 (1980).

■ Timothy Bockman asserts that the trial court erred when it refused to give proposed jury instructions on self–defense, justification, lawful force, and unlawful arrest. A

---

[3]A brief review of the evidence presented shows the insignificance of the evidence that a dog tracked the Bockmans from the dentist's office to their residence. A witness who worked nights near the dentist's office testified that he saw two men coming out of the dentist's office early on the morning of October 18, 1980, one of whom wore a green jacket. He approached within 18 inches of the men. After the two men left the area, he saw that a window in the office had been broken and he called police. A short time later, and in court, he *identified* the Bockmans as the men he saw near the dentist's office.

Officer Tucker testified that as he observed the Bockman residence shortly after the burglary, he saw a young man inside breathing very hard. Officers Tucker and Miller each testified that after they approached the residence and the door was opened they noticed that the cuffs, shoes, and socks of the Bockmans were wet, indicating they had been walking on the dewy lawn. Both officers also testified that they saw a green jacket in the living room of the Bockman residence. In addition, Christian Bockman testified that after his brothers were arrested and jailed on October 18, he disposed of dental tools that his brothers had taken.

defendant is entitled to have his theory of the case submitted to the jury under appropriate instructions when the evidence warrants it. *See State v. Safford,* 24 Wn. App. 783, 604 P.2d 980 (1979). Appellants have failed to specify evidence in the record supporting such instructions. Timothy Bockman reacted to arrest by picking up a knife, lunging at a leashed police dog and then at Officer Miller, and knocking away Officer Tucker's revolver. These circumstances do not provide any evidence of justification, lawful force, unlawful arrest, or self-defense; accordingly, the trial court did not err by refusing to give the instructions. *See State v. Allen,* 94 Wn.2d 860, 621 P.2d 143 (1980).

ALLEGED ERRORS IN MURDER TRIAL

The Bockmans claim approximately a dozen errors in the murder trial. None of the claims has merit.

The Bockmans assert error by the trial court because dog tracking evidence and prearrest statements were admitted and because their arrests were without warrants. There was no error for the reasons discussed with respect to the assault and burglary charges.

Appellants question whether the trial court correctly ruled that they presented insufficient evidence to warrant an evidentiary hearing as to the search warrant affidavit. The Bockman brothers claim that the information they provided to the trial court demonstrated that there were material omissions in the affidavits used to obtain the warrant to search the Bockman residence. The key defects alleged by the Bockman brothers are (1) that the primary informant, Ray Kirkham, was a convicted felon who repeatedly had been caught in lies concerning his involvement in the Lauricella homicide; (2) that nearly all of the Kirkham brothers' information was derived from Ray Kirkham, and that Daniel Kirkham, Ray's brother, had admitted destroying evidence in an effort to protect his brother and plotting to plant evidence in the Bockmans' front yard to steer the police investigation away from his

brother Ray. The Bockmans assert that the omissions and alleged misrepresentations in the affidavit were deliberate.

 If the information relied upon by the judicial officer issuing a search warrant includes material misstatements or omissions relevant to a determination of probable cause, and their inclusion or omission is intentional or done with reckless disregard for the truth, the Fourth Amendment requires an evidentiary hearing to be held. *Franks v. Delaware,* 438 U.S. 154, 57 L. Ed. 2d 667, 98 S. Ct. 2674 (1978). The trial court correctly determined that the defendants did not meet the necessary preliminary showing of a material omission or misstatement. The defendants included in their motion a copy of the challenged warrant and affidavit in support thereof, police reports, and transcribed statements of the informant. They also offered to call the police and prosecuting attorney to testify as to what information was supplied to the issuing magistrate.

The trial court ruled:

> From a purist standpoint, there could have been more information presented to the issuing magistrate. . . .
>
> The affidavit is not a model of thoroughness or clarity certainly, but it certainly doesn't indicate any intentional or reckless misstatement, or any negligent misstatement. There may be some innocent omissions in terms of not being totally thorough as one might be in preparing a case for submission to a trier of fact, but there is no basis for finding that there is any reason to hold any evidenciary [*sic*] hearing on the basis of the showing that has been made by the defendants. . . .
>
> . . .
> The arguments here are directed towards what might be considered the ideal, but that is not the requirement in the process of investigation.

The defendants did not carry their burden. The affidavit supporting the search warrant did draw to the magistrate's attention that Ray Kirkham had earlier denied involvement in the burglary of Mrs. Lauricella's residence, and the affidavit included statements by Ray Kirkham directly against his penal interest. Considerable weight should be given to

an admission against an informant's penal interest. *United States v. Martin,* 615 F.2d 318 (5th Cir. 1980).

The Bockman brothers allege the trial court erred when it ordered blood samples to be taken from them, largely because the order was based on the search warrant they believe is defective. However, the search warrant is not defective. The taking of blood samples is authorized by CrR 4.7(b)(2)(vi). When granting the prosecution's request for blood samples, the trial court stated:

At this time the Court does find that this is a reasonable request; that there is probable cause that Mr. Kirkham's information—Court is led to believe—feels that there is probable cause that Mr. Kirkham was in the residence. His fingerprint was there. That Mr. Kirkham indicated that he had seen items in the home with blood; that, upon a search warrant, these items were found within the residence. They match the description of the items. These items had been in the residence of the victim and now were in the defendants' home.

. . .

The Court does find that there is probable cause in granting the order.

The trial court did not commit error by ordering the blood samples. *See State v. Osborne,* 18 Wn. App. 318, 569 P.2d 1176 (1977); *State v. Batten,* 17 Wn. App. 428, 563 P.2d 1287 (1977).

The Bockmans complain that the trial court erred in granting the State's motion to amend the information by adding counts of assault. This was not error. The Bockman brothers were originally charged by information with burglary and murder. The information was subsequently amended to add another defendant. After appellants' asserted rights to a jury trial and rights under the Fourth and Fifth Amendments regarding suppression of statements and evidence obtained at the time of arrest, and after the prosecution had successfully dismissed the murder charge, the prosecution moved to amend the information and add against the brothers the charge of assault. The Bockmans claim that the addition of the assault charge

constitutes prosecutorial vindictiveness and the trial court should not have permitted the State to amend the information.

The trial court may permit an amendment of the information at any time before the verdict if "substantial rights of the defendant are not prejudiced." CrR 2.1(d); *State v. Jones,* 26 Wn. App. 1, 612 P.2d 404, *review denied,* 94 Wn.2d 1013 (1980). At the amending of the information, both Bockmans claimed lack of notice, not prejudice. The court found no prejudice existed in amending the information.

Prosecutorial vindictiveness is "intentional filing of a more serious crime in retaliation for a defendant's lawful exercise of a procedural right." *State v. McKenzie,* 31 Wn. App. 450, 452, 642 P.2d 760 (1981). The mere appearance of vindictiveness is not sufficient to establish a due process violation. *State v. McKenzie, supra* at 452–53. Appellants' arguments are unpersuasive that the prosecution was vindictive in the filing of the assault charge. *Cf. Bordenkircher v. Hayes,* 434 U.S. 357, 54 L. Ed. 2d 604, 98 S. Ct. 663 (1978); *United States v. Goodwin,* 457 U.S. 368, 73 L. Ed. 2d 74, 102 S. Ct. 2485 (1982).

Appellants claim their right to confront and cross–examine a witness for the prosecution was violated. We find no violation. During extensive cross examination of Ray Kirkham by counsel for Timothy Bockman, Mr. Kirkham was asked if his attorney had told him not to pass up the plea bargain arrangement. The State objected and the court sustained the objection. After a brief recess, cross examination continued on the same line of questioning. Appellants claim that the trial court erroneously terminated cross examination of Ray Kirkham.

In *Davis v. Alaska,* 415 U.S. 308, 316–18, 39 L. Ed. 2d 347, 94 S. Ct. 1105 (1974), the only authority cited by appellant, the Supreme Court held that a criminal defendant's right to impeach the credibility of a witness by cross examination prevails over a State's interest in preserving the confidentiality of juvenile adjudications. *Davis v.*

*Alaska* is inapposite to the case at bench, in which counsel was permitted extensive cross examination as to Ray Kirkham's reasons for any bias. Appellant Timothy Bockman was not denied the right of effective cross examination, nor was Michael Bockman, who also appeals from the court's ruling.

The Bockmans claim that the trial court abused its discretion by admitting certain photographs into evidence. There was no abuse of discretion. The Bockman brothers complained about the admission of three photographs: the first, of the deceased while she was alive; the second, of the deceased's hand showing a stab wound; and the third, of the deceased lying on her bedroom floor. The Bockmans claim that there was no basis for admission of the photographs.

The trial court reviewed the photographs and did not find them prejudicial. The photographs may have helped the jury understand how the victim was attacked and may have aided the jury in determining what caused the victim's death. *See State v. Adams,* 76 Wn.2d 650, 657, 458 P.2d 558 (1969), *rev'd,* 403 U.S. 947 (1971); *State v. Pennewell,* 23 Wn. App. 777, 598 P.2d 748 (1979). As the Supreme Court stated:

> A bloody, brutal crime cannot be explained to a jury in a lily–white manner to save the members of the jury the discomforture [*sic*] of hearing and seeing the results of such criminal activity.

*State v. Adams, supra* at 656. The trial court did not abuse its discretion by admitting into evidence the photographs. *See State v. Huelett,* 92 Wn.2d 967, 603 P.2d 1258 (1979).

Timothy Bockman claims the trial court did not properly consider his pretrial motion in limine to exclude evidence at the murder trial regarding the dental office burglary and the assault. Bockman relies on the fundamental rule frequently expressed by our courts that evidence of other criminal activity is generally inadmissible in a criminal prosecution except for limited purposes, such as showing motive or intent, plan, identity, or absence of accident or

mistake. *E.g., State v. Dinges,* 48 Wn.2d 152, 292 P.2d 361 (1956); *State v. Goebel,* 40 Wn.2d 18, 240 P.2d 251 (1952); *State v. Terry,* 10 Wn. App. 874, 520 P.2d 1397 (1974).

We are therefore presented with the issue of whether the evidence complained of was properly admitted under recognized exceptions to the general rule of exclusion. As noted previously, evidence of other criminal activity may be admitted to show motive or intent, the absence of accident or mistake, scheme or plan, or identity. This list, however, is not exclusive. *State v. Dinges, supra.* Our courts have previously recognized the so–called "handiwork" exception, *State v. Fernandez,* 28 Wn. App. 944, 628 P.2d 818, 640 P.2d 731, *review denied with remand,* 94 Wn.2d 1026 (1980), and the exception for criminal acts which are part of the whole deed, *State v. Jordan,* 79 Wn.2d 480, 487 P.2d 617 (1971). An exception is also recognized for evidence that is relevant and necessary to prove an essential ingredient of the crime charged. *State v. Mack,* 80 Wn.2d 19, 490 P.2d 1303 (1971). E. Cleary, *McCormick on Evidence* § 190, at 448–51 (2d ed. 1972) lists 10 categories of exceptions. Heading the list is the "res gestae," or "same transaction," exception, wherein evidence of other crimes is admissible, "[t]o complete the story of the crime on trial by proving its immediate context of happenings near in time and place." (Footnote omitted.) E. Cleary, at 448.

Under the res gestae, or same transaction, analysis, the evidence of the burglary was admissible in the instant case. The evidence substantially connected the Bockman brothers to the burglary, as well as to the murder of Mrs. Lauricella. As stated in *State v. Tharp,* 27 Wn. App. 198, 205, 616 P.2d 693 (1980), *aff'd,* 96 Wn.2d 591, 637 P.2d 961 (1981):

> The jury was entitled to know the whole story. The defendant may not insulate himself by committing a string of connected offenses and thereafter force the prosecution to present a truncated or fragmentary version of the transaction by arguing that evidence of other

crimes is inadmissible because it only tends to show the defendant's bad character. "[A] party cannot, by multiplying his crimes, diminish the volume of competent testimony against him." *State v. King,* 111 Kan. 140, 145, 206 P. 883, 885 (1922).

*See also State v. Jordan, supra; State v. Battle,* 16 Wn. App. 66, 553 P.2d 1367 (1976). There is sufficient evidence in the record that the trial court considered this issue. The trial court is vested with wide discretion in determining if the danger of unfair prejudice outweighs the probative value of such evidence. *See State v. Tharp, supra.* There was no abuse of discretion.

Timothy Bockman asserts that the trial court made numerous errors in instructing the jury. First he claims that the trial court's instructions are defective as to the mental state necessary to find him guilty of first degree murder as an accomplice.

The definition of accomplice, contained in instruction 11, is essentially WPIC 10.51:

11

A person is an accomplice in the commission of a crime, if, with knowledge that it will promote or facilitate the commission of the crime, he or she either:

(1) solicits, commands, encourages, or requests another person to commit the crime; or

(2) aids or agrees to aid another person in planning or committing the crime.

The word "aid" means all assistance whether given by words, acts, encouragement, support or presence. A person who with knowledge of a crime is present at the scene and is ready to assist by his or her presence is aiding in the commission of the crime.

RCW 9A.08.020(3)(a) states that an accomplice is one who aids a principal: "[w]ith *knowledge* that it will promote or facilitate the commission of the crime . . ." (Italics ours.) The accomplice statute implicitly demonstrates that the State need not prove that the principal and accomplice share the same mental state. There was no error as to the instruction concerning the mental state of the accomplice. *See State v. Rotunno,* 95 Wn.2d 931, 631 P.2d

951 (1981); *In re Wilson,* 91 Wn.2d 487, 588 P.2d 1161 (1979).

The second error Timothy Bockman alleges pertains to instruction 5,[4] which he believes unfairly shifts the burden to the defendant to prove lack of knowledge. Neither Bockman took exception to the giving of their instruction 5 because, in fact, Michael Bockman proposed instruction 5. Furthermore, instruction 5 is substantially WPIC 19.01 and is without defect. *State v. McCullum,* 98 Wn.2d 484, 656 P.2d 1064 (1983) does not apply to the case at bench. The court in *McCullum* concluded that an instruction placing the burden on the defendant to prove self–defense was improper. Contrary to the circumstances in *McCullum,* instruction 5 given at the Bockmans' trial did not relieve the State of its burden to prove each element of the crime beyond a reasonable doubt.

The Bockmans also both complain that the trial court gave an erroneous definition of reasonable doubt by giving instruction 2, which is essentially WPIC 4.01.[5] The instruc-

---

[4]Instruction 5 states:

"It is a complete defense to a charge of murder in the first degree based upon committing burglary in the first degree that the defendant:

"(1) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and

"(2) Was not armed with a deadly weapon, or any instrument, article or substance readily capable of causing death or serious physical injury; and

"(3) Had no reasonable grounds to believe that any other participant was armed with such a weapon, instrument, article or substance; and

"(4) Had no reasonable grounds to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury."

[5]Instruction 2 states:

"The defendants have entered pleas of not guilty. Those pleas put in issue every element of the crime charged. The plaintiff has the burden of proving each element of the crime beyond a reasonable doubt.

"A defendant is presumed innocent. This presumption continues throughout the entire trial unless you find it has been overcome by the evidence beyond a reasonable doubt.

"A reasonable doubt is one for which a reason exists and may arise from the evidence or lack of evidence. It is such a doubt as would exist in the mind of a reasonable person after fully, fairly and carefully considering all of the evidence or lack of evidence. If, after such consideration, you have an abiding belief in the

tion is without infirmity and has been approved by the Washington Supreme Court. *See State v. Cox,* 94 Wn.2d 170, 615 P.2d 465 (1980). Neither Bockman excepted to the instruction defining reasonable doubt; therefore any claimed error was not preserved.

Timothy Bockman claims that the trial court erred by giving instruction 4, which concerns first degree felony murder. Bockman asserts he was convicted of first degree felony murder even though the jury did not believe he was guilty of first degree burglary or murder. Supporting this theory, Timothy Bockman points to the question the jury directed to the court during the first evening of deliberations:

> If the defendants leave the scene of a second degree burglary, then an assault occurred by a third party, are those two then guilty by association of first degree burglary? Also clarification of the definition of immediate flight.

The court did not provide a substantive answer to the jury question but told the jury, "You have received all of the Court's instructions." No special or general interrogatories were requested or given.

The decision of the jury is contained exclusively in its verdict. The question sent to the judge is not a professed final determination by the jury. The trial court did not err in giving instruction 4.

Timothy Bockman also claims that instruction 11 is constitutionally deficient because it does not require that the State prove beyond a reasonable doubt that Timothy Bockman knew the principal had a weapon or that he knew the principal intended to assault someone in the course of the burglary.

As authority for his assertion, Timothy Bockman cites *State v. Plakke,* 31 Wn. App. 262, 639 P.2d 796 (1982), which held that the State must prove beyond a reasonable doubt that an accomplice knew the principal in the

truth of the charge, you are satisfied beyond a reasonable doubt."

crime of first degree robbery was armed. While this court recently diluted the requirement of *Plakke* in *State v. Davis,* 35 Wn. App. 506, 667 P.2d 1117, *review granted,* 100 Wn.2d 1028 (1983), we note that even applying the *Plakke* requirement leads to the conclusion that the instruction here was proper. *Plakke,* at page 266, held:

> [W]hen the evidence permits a finding that an alleged accomplice to first degree robbery is unaware of the presence of a weapon or what appears to be a weapon, the alleged accomplice *is entitled to an instruction on second degree robbery.*

(Italics ours.) In the case at bench, the jury was instructed on second degree burglary primarily in instructions 6, 7, and 8; therefore, the requirements of *State v. Plakke, supra,* were fulfilled. Instruction 11, WPIC 10.51, is without error. It has been approved in *State v. Williams,* 28 Wn. App. 209, 622 P.2d 885 (1981).

Timothy Bockman contends that the felony murder statute violates due process and equal protection constitutional provisions because a person who enters a house with only the intent to commit assault but kills the owner of the house is treated in the same category as one having a premeditated intent to kill and as one creating a grave risk of death under circumstances manifesting an extreme indifference to human life. The appellant claims that the felony murder sections of the homicide statutes must be struck down as they create an arbitrary and irrational relationship between guilt and punishment. We reject appellant's argument. We do not find the felony murder sections of the homicide statutes to be arbitrary and irrational; they do not violate due process or equal protection provisions.

Further, appellant states that in the case at bench the underlying felony supporting the felony murder charge is first degree burglary, which is distinguished from second degree burglary by an assault occurring during the burglary. Appellant asserts that the assault and the murder charges should merge. Such a merger, according to appellant, would have removed a basis for charging the appel-

lants with felony murder. Where the precedent felony in a felony murder is an assault and inherent in the homicide, the assault does not merge into the resulting homicide. *State v. Harris,* 69 Wn.2d 928, 421 P.2d 662 (1966).

> While it may be that the felony murder statute is harsh, and while it does relieve the prosecution from the burden of proving intent to commit murder, it is the law of this state. . . .
>
> The rejection by this court of the merger rule has not been challenged by the legislature during the nearly 10 years since *Harris,* nor have any circumstances or compelling reasons been presented as to why we should overrule the views we expressed therein.

*State v. Thompson,* 88 Wn.2d 13, 17–18, 558 P.2d 202 (1977). Accordingly, we find no merit to the appellant's contentions on this issue.

■ Timothy Bockman asserts error because the jury failed to indicate whether he acted as a principal or as an accomplice in the commission of a single crime. Bockman cites no case indicating the existence of such a requirement. Furthermore, a unanimous verdict is required if separate crimes are charged, but not when alternate means of committing a single crime are charged in which the alternate means are not repugnant to each other. *State v. Arndt,* 87 Wn.2d 374, 553 P.2d 1328 (1976). An accomplice is not charged with two crimes; he is charged with, and liable for, a particular crime committed by his principal. RCW 9A.08-.020. Nor is aiding in the commission of the crime a method or mode of committing that crime, and the elements of the offense remain the same whether the defendant is alleged to have acted as principal or accomplice. *State v. Carothers,* 84 Wn.2d 256, 525 P.2d 731 (1974). The jury was not required to unanimously determine if either defendant acted as principal or accomplice. *State v. Carothers, supra; Holland v. State,* 91 Wis. 2d 134, 280 N.W.2d 288 (1979).

Michael Bockman claims there was insufficient evidence as to the alternate bases for criminal liability for the murder.

■ Reviewing the evidence in the light most favorable

to the prosecution, *see State v. Gerber,* 28 Wn. App. 214, 622 P.2d 888 (1981), there is sufficient evidence for a rational trier of fact to have found the defendants guilty of first degree murder either as accomplice or principal beyond a reasonable doubt; thus, there is no error.

Finally, because of the opinion filed June 9, 1983 in *State v. Smalls,* 99 Wn.2d 755, 665 P.2d 384 (1983), we reconsider the Bockmans' claim that the trial court erred by permitting the jury to separate during deliberations at the murder trial.

On March 30, 1981, before jury deliberations had begun in the instant case, the defense moved to sequester the jury. The defense in part argued that the jury should be sequestered because President Reagan had been shot that day, increasing the likelihood of prejudicial communications to the jurors. The trial judge, believing CrR 6.7 permitted separation of the jury after deliberations had commenced if there was no showing of probable prejudice, denied the motion and allowed the jury to separate.[6]

Because of the interpretation of CrR 6.7 in *Smalls,* we hold that the trial court erred by denying the defense motion to sequester the jury during deliberations. The Supreme Court in *Smalls* held that the version of CrR 6.7 then in effect applied only to proceedings prior to the beginning of deliberations and that RCW 4.44.300 was not superseded by CrR 6.7; therefore, the court said RCW 4.44.300 continued to prohibit separation of the jurors during deliberations if the defendant objects.[7] *Smalls,* at 767.

---

[6] The version of CrR 6.7 in effect at the time *State v. Smalls,* 99 Wn.2d 755, 665 P.2d 384 (1983) was decided provided in part: "The jury may be allowed to separate if the court finds that good reason exists to believe that such would not jeopardize a fair trial." In fairness to the trial judge, we point out that it was unclear whether CrR 6.7 superseded RCW 4.44.300, which prohibited jury separation during deliberations, until the *Smalls* decision on June 9, 1983, more than 2 years after jury separation during deliberations was permitted here.

[7] We note that soon after the *Smalls* decision, the Supreme Court amended CrR 6.7 to specifically govern separation of jurors during deliberations. The new rule reads in pertinent part: "During trial and deliberations the jury may be

Here the trial court denied the appellants' motion to sequester the jury. Under the rule announced in *Smalls* that RCW 4.44.300 was controlling, the trial court erred by failing to sequester the jury.

The next question is whether the Bockmans were prejudiced by the jurors' separation. The court in *Smalls* established that prejudice to the defendant is presumed when the trial court permits the jury to separate over the defendant's objection. *Smalls,* at 767. The court stated:

> The juror himself may well be unaware of the subtle influences which affect his decision. For this reason, admonition and instruction of the jury is probably ineffective in ameliorating the prejudicial effects of separation during the deliberations. For this reason also, the use of juror affidavits to prove a probability of prejudice is of dubious value; a juror cannot swear to being prejudiced by influences of which he is unaware.

*Smalls,* at 767.

Our review of the record convinces us that the State has met its burden for overcoming the presumption that the Bockmans were prejudiced by the jurors' separation. As we noted at the outset of this opinion, we remanded this case to the trial court for a hearing and entry of findings on precisely this issue. The trial court entered the following findings of fact:

## II.

Prior to allowing the jurors to separate, the court instructed the jurors to avoid exposure to all news media as well as to refrain from discussing the case with anyone. The court admonished the jury as follows: "Ladies and gentlemen of the jury: I am about to allow you to separate for the evening, but before doing so I will repeat once again all of the admonitions that I have been giving you throughout the trial, i.e.: 1. Do not discuss this case among yourselves or with anyone else. 2. Do not seek any evidence outside of the courtroom. 3. Do not expose yourselves to any of the news media and do not allow anyone to bring any media matter to your attention."

---

allowed to separate unless good cause is shown, on the record, for sequestration of the jury."

## III.

["A"], jury foreman, recalls "adhering strictly" to the court's instructions to avoid exposure to all news media and discussion of this case. Upon being allowed to separate from the other jurors, ["A"] received a ride to his home in Bellevue from another juror. They did not discuss the case or any current events. ["A"] reached his residence at approximately 10:00 p.m. He then retired for the night. After awaking the next morning, he returned to the courthouse. He did not learn of the attempted assassination of President Reagan until after the conclusion of the trial.

## IV.

Juror ["B"] followed the court's instructions to avoid exposure to all news media as well as discussion of this case. Upon being allowed to separate from the other jurors, ["B"] received a ride to his Kent residence from another juror. They did not discuss the case or any current events. ["B"] retired for the night upon arriving home. ["B"] was alone in his house that night. He arose early on April 1 and returned to the courthouse. ["B"] does not recall when he first learned of the attempted assassination of President Reagan.

## V.

Juror ["C"] followed the court's instruction to avoid exposure to all news media as well as discussion of this case. Upon being allowed to separate from the other jurors, ["C"] returned by himself to his Queen Anne residence. He went to bed. At approximately midnight, his wife informed him that there had been an assassination attempt on President Reagan. ["C"] cannot imagine that that news had any possible effect on his deliberations in this case. The next morning, ["C"] returned to the courthouse and resumed deliberations.

## VI.

Juror ["D"] followed the court's instructions to avoid exposure to all news media as well as discussion of this case. Upon being allowed to separate from the other jurors, ["D"] went directly home. No one else was there. He fixed a snack and then went to bed. Upon arising the next morning, he returned to the courthouse to resume deliberations. ["D"] does not recall when he learned of the attempted assassination of President Reagan.

## VII.

Juror ["E"] followed the court's instruction to avoid exposure to all news media as well as discussion of this case. Upon being allowed to separate from the other jurors, ["E"] drove home. She immediately went to bed. When she arose the next morning, she did her chores and then returned to the courthouse to resume deliberations. ["E"] does not recall specifically when she first learned of the attempted assassination of President Reagan, although her first recollection of the news dates back to her return home after the second and final day of deliberations.

## VIII.

Juror ["F"] followed the court's instructions to avoid exposure to all news media as well as discussion of this case. She was "afraid" of what would happen if she were to disobey the court's instructions. Upon being allowed to separate from the other jurors, ["F"] returned to her residence and immediately went to bed. She returned to the courthouse the next morning to resume deliberations. ["F"] does not recall the assassination attempt on President Reagan. She further recalls not knowing about that incident at the time of this case.

## IX.

Juror ["G"] followed the court's instruction to avoid exposure to all news media as well as discussion of this case. Upon being allowed to separate from the other jurors, she rode home in her car. She didn't discuss the case or listen to the radio. Upon arriving home, she went to bed. When she arose the next morning, she returned to the courthouse to resume deliberations. On the night of March 31, she learned from her husband of the attempted assassination of President Reagan. She was not shocked by the news. Her decision in this case was completely independent of events surrounding President Reagan.

## X.

Juror ["H"] followed the court's instruction to avoid exposure to all news media as well as discussion of this case. Upon being allowed to separate from the other jurors, ["H"] went home and went to bed. She returned to the courthouse the next morning. She did not learn of the attempted assassination of President Reagan until after the conclusion of this case.

## XI.

Juror ["I"] followed the court's instruction to avoid exposure to all news media as well as discussion of this case. Upon being allowed to separate from the other jurors, ["I"] received a ride home from another juror. When she arrived home, her husband departed for his night job. She was alone all night. She returned to court the next morning to resume deliberations. She did not learn of the attempted assassination until after the conclusion of this case.

## XII.

Juror ["J"] followed "absolutely" the court's instructions to avoid exposure to all news media as well as discussion of this case. Upon being allowed to separate from the other jurors, she drove to her Redmond residence. Upon arriving there, she immediately went to bed. As she went to bed, she learned from her husband that there had been an assassination attempt on President Reagan. She was relieved to learn that the President's injuries were not serious, but was more preoccupied with this case. She was more interested in getting a good sleep so she would be fully prepared mentally for the next day's deliberations. The Reagan news had no bearing on her decision in this case. The next morning, ["J"] awoke and returned to the courthouse to resume deliberations.

## XIII.

Juror ["K"] followed the court's instruction to avoid exposure to all news media as well as discussion in this case. Upon being allowed to separate from the other jurors, ["K"] returned to her home. Her husband advised her of the attempted assassination of President Reagan. Although ["K"] was surprised by the news, she put it out of her mind, thinking, "I don't have time to think about this now." The knowledge about President Reagan had no bearing on her decision in this case. When she arrived at her residence she went to bed. The next morning she returned to the courthouse to resume deliberations.

## XIV.

Juror ["L"] followed the court's instruction to avoid exposure to all news media as well as discussions of this case. Upon being allowed to separate from the other jurors, he went home and went to bed. He returned to the courthouse the next morning to resume deliberations. ["L"] believes that he did not learn of the attempted

assassination of President Reagan until after the trial was over.

## XV.

The court finds that all jurors were credible witnesses in every respect.

## XVI.

The fact of President Reagan's shooting had absolutely no effect on the deliberation or decision of any juror in this case.

## XVII.

When the jurors were separated during jury deliberations, they did not discuss the case with anyone nor did anyone discuss the case with them. Further, none of the jurors were exposed to media coverage of any kind while separated during deliberations.

While we are mindful that the court in *Smalls* noted the dubious value of jurors' affidavits, we view these findings as being far more probative of the effect of separation on the jurors' deliberation and decision than affidavits because they were entered by an experienced and careful trial judge after the appellants had an opportunity to fully cross–examine the jurors and present other evidence. The findings make it clear that the jurors were not influenced by their separation.

In addition, we are persuaded by another consideration. The time sequence of the jurors' deliberation, separation, and verdict suggests they were not affected by the separation. Here, the jurors began deliberations at about 4 p.m. and separated at about 9:30 p.m. on the evening of March 30. They returned to deliberate at approximately 9 a.m. on March 31. They did not return a verdict until after 4:30 p.m. on March 31. In contrast, deliberations began in *Smalls* at about 11:45 a.m. on June 11. The jurors were sent home at 8:45 p.m. They returned the following day at 9 a.m. and returned a verdict by 10 a.m. The proximity of the verdict to the return from separation in *Smalls* suggests they were influenced during separation. Conversely, in this case the 7½–hour delay between the return of the jury following separation and the verdict, although perhaps not conclusive standing alone, suggests the jury was not subject

502

to outside influences that affected the verdict.

In conclusion, in light of the trial court's extensive and detailed findings of fact on the issue and the time sequence involved, we hold that the Bockmans were not prejudiced by the trial court's failure to sequester the jury during deliberations.

Other issues raised are without merit.

The judgments are affirmed.

CALLOW and ANDERSEN, JJ., concur.

Review denied by Supreme Court July 13, 1984.