IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 82064-8-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| PAUL CHARLES TLUSTY, JR., | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | |

ANDRUS, A.C.J. — Paul Charles Tlusty, Jr. appeals his convictions for residential burglary, third degree theft, and bail jumping. On appeal, Tlusty argues he received ineffective assistance when his trial counsel failed to challenge the admissibility of a showup identification and failed to request an instruction advising the jury that dog tracking evidence required corroboration. Because he failed to demonstrate that his trial counsel was deficient or that he suffered prejudice, we affirm his convictions.

<u>FACTS</u>

James Morrison and the Giles family were neighbors in a cul-de-sac in Puyallup, Washington. On January 20, 2018, David Giles[1] and his family were

---

[1] Because the witnesses share a last name, we refer to David and Madeline Giles by their first names. We do so for clarity and intend no disrespect.

Citations and pin cites are based on the Westlaw online version of the cited material.

sitting down for dinner when they heard "an extremely loud bang." David stuck his head out his back door and heard glass breaking. When he and his family members went outside, they saw someone inside his neighbor's house.

David walked into Morrison's driveway where he had a direct view of his neighbor's front windows. The blinds were open and the lights were on. David saw a person "darting" around the house. Because he knew Morrison was not home and there was someone inside who should not be, he asked his daughter, Madeline, to call 911. David and Madeline went to the side of the house to "get a better view of all the side windows."

For approximately ten minutes, David watched the intruder moving in the house from about 30 feet away. David could see clearly into the house and "got a really good view" because the person inside stayed in front of him for about 20 seconds when David pointed his flashlight into the windows. David described the man as a slender, white man with "maybe a little bit of facial hair," wearing dark clothes and a dark, beanie-like hat, and carrying a duffel bag.

While on the phone with 911, Madeline stood with her father. She testified that they both "got a pretty good look" at the intruder when he stood in front of the window for approximately 15 seconds and stated he was wearing a dark hoodie and beanie. However, she "personally didn't get a good look at the face" because she was on the phone and "was kind of all over the place."

David testified that about five minutes after losing sight of the intruder in the house, he heard someone walking in the woods behind the houses and saw "an illuminated cell phone light guiding this person." David then yelled, "what the fuck

are you doing back there?" The person yelled back "I'm taking a walk through the woods, mother fucker." David yelled out that the police were on their way.

When the police arrived, they found a broken bedroom window in the rear of the house. A set of French doors off the rear deck looked damaged, as if someone had tried to kick them in. When they entered the house, they found a rock inside that appeared to have been thrown through the bedroom window.

Sheriff Deputy Isaac Finch and his German Shepherd, Ammo, arrived at the scene of the burglary to track the suspect. Deputy Finch and Ammo began to track for a human scent in Morrison's backyard in the general location of the last known whereabouts of the suspect approximately 21 minutes after Madeline called 911. Deputy Finch saw Ammo pick up a scent about 5 or 6 feet from the woods. Ammo followed the scent into the woods and they came across two duffle bags in the woods. Morrison later identified these bags and their contents—clothing, cell phones, and a Kindle Fire tablet, as belonging to him. Ammo indicated to Deputy Finch that the human scent the dog picked up in Morrison's backyard was on the duffel bags as well.

Meanwhile, Sheriff Deputy Dustin Markholt, patrolling nearby, saw Tlusty "pop[] his head out of the woods" on 170th Street and walk in front of his patrol car. Tlusty matched the suspect's description and law enforcement stopped and detained him.

Deputy Finch learned that Deputy Markholt had detained a suspect. But Ammo indicated the human scent path continued past the bags so Deputy Finch continued the track to a gravel road. They followed the scent path to the spot where Tlusty was detained. The deputies placed Tlusty into a patrol car and Ammo

tracked to the spot where Tlusty had been standing. Ammo had indicated directly on Tlusty's backpack, indicating the scent on the backpack was the same scent Ammo had followed from Morrison's house.

Deputy Markholt asked David and Madeline to accompany him for a "field show-up" identification. Both David and Madeline identified Tlusty as the man they witnessed inside Morrison's house. David testified that although Tlusty was wearing a plaid button up shirt, the shirt was over a long-sleeved black shirt and he was wearing the same hat. David overheard Tlusty talking to the police and recognized Tlusty's voice as the same voice he had heard yelling at him from the woods behind Morrison's house. David was "positive" the person in custody was the person he saw in his neighbor's home. Madeline testified that Tlusty had a similar build, skin complexion, and hat and also positively identified him as the man in the house.

Sheriff Deputy Michael Rawlins, who participated in Tlusty's detention and arrest, told Tlusty there had been a burglary in the general area. Tlusty said he did not know anything about it and had nothing to do with it. He claimed he was merely waiting outside a friend's house for someone to pick him up. But Deputy Rawlins testified Tlusty did not identify which house belonged to his friend.

Morrison arrived home from work while the police were searching for the intruder. He found two kitchen windows with screens off on the ground. The outside light near his French doors had been unscrewed and the doors were damaged. The drawers in the master bedroom had been opened and he was missing cell phones, clothing, and a Kindle Fire tablet. The two duffle bags the

police had found in the woods behind his home contained the items stolen from his bedroom.

At trial, Tlusty testified he had been living for a year in the home of Garrison Schrum, a neighbor. He claimed he had been inside Schrum's home, waiting for a friend, Kathryn Kitchens, to arrive to drive him to another friend's home. According to Tlusty, when he looked out a window and saw the police lights, he went outside to make sure Kitchens had not been pulled over. Tlusty testified that when he walked out of the house and down the driveway, the police saw him and began to question him. Tlusty stated he told police he was staying nearby but when they asked him to identify the house, he thought they were asking him to identify the house he allegedly had burglarized, so he told the police that he did not know what the police were talking about.

The State charged Tlusty with one count of residential burglary and one count of third degree theft. The State subsequently added one count of bail jumping based on Tlusty's failure to appear at a pretrial hearing. The jury found him guilty on all three counts.

## ANALYSIS

Tlusty contends he was denied his Sixth Amendment right to effective assistance of counsel for two reasons. First, he contends his counsel should have challenged the showup identification. Second, he argues his counsel should have requested a jury instruction advising the jury of the unreliability of dog track evidence.

A criminal defendant has the right to effective assistance of trial counsel under the Sixth Amendment to the United States Constitution and article I, section

22 of the Washington State Constitution. In re Pers. Restraint of Davis, 152 Wn.2d 647, 672, 101 P.3d 1 (2004). To establish a violation of that right, the defendant must show that counsel's representation was deficient and that counsel's deficient representation caused prejudice. Id. at 672-73 (quoting State v. McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995)).

To establish deficient performance, the defendant must show that trial counsel's performance fell below an objective standard of reasonableness. Id. at 672. There is a strong presumption that defense counsel's conduct was not deficient. State v. Reichenbach, 153 Wn.2d 126, 130, 101 P.3d 80 (2004). To overcome this presumption, Tlusty must show the absence of any "conceivable legitimate tactic explaining counsel's performance." Id. Trial strategy and tactics cannot form the basis of a finding of deficient performance. State v. Cienfuegos, 144 Wn.2d 222, 227, 25 P.3d 1011 (2001) (quoting State v. Hendrickson, 129 Wn.2d 61, 77-78, 917 P.2d 563 (1996)). The reasonableness of trial counsel's performance is reviewed in light of all of the circumstances of the case at the time of counsel's conduct. State v. Lord, 117 Wn.2d 829, 883, 822 P.2d 177 (1991).

Prejudice can be shown only if there is a reasonable probability that, absent counsel's unprofessional errors, the result of the proceeding would have been different. Davis, 152 Wn.2d at 67273.

A.    Failure to Challenge Identification

Tlusty first contends his counsel was deficient in failing to challenge what he describes as an impermissibly suggestive showup identification. Where the defendant's ineffective assistance claim is based on trial counsel's failure to challenge the admissibility of evidence, the defendant must show the absence of

- 6 -

a legitimate strategic or tactical reason for not objecting, the likelihood that the objection would have been sustained, and a different outcome at trial had the evidence not been admitted. State v. Saunders, 91 Wn. App. 575, 578, 958 P.2d 364 (1998). Tlusty has failed to meet this test.

We can conceive of a legitimate reason for counsel choosing not to object to the showup identification. Counsel could have concluded, as we do, that there appears little likelihood such an objection would have been successful.

An out-of-court identification is inadmissible if the identification procedure was so "'impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" State v. Cook, 31 Wn. App. 165, 171, 639 P.2d 863 (1982) (quoting Simmons v. United States, 390 U.S. 377, 384, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968)). The court will review the totality of the circumstances to determine whether the suggestiveness created a substantial likelihood of irreparable misidentification. State v. Maupin, 63 Wn. App. 887, 897, 822 P.2d 355 (1992). "Although showups are generally suspect, they are not per se unnecessarily suggestive. A showup that is held shortly after the crime was committed and in the course of a prompt search for the suspect is permissible." State v. Kraus, 21 Wn. App. 388, 391-92, 584 P.2d 946 (1978) (internal citations omitted).

To determine whether the identification was reliable, the court will consider (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of his prior description of the criminal, (4) the level of certainty demonstrated at the confrontation, and (5) the

time between the crime and the confrontation. <u>Maupin</u>, 63 Wn. App. at 897, (citing <u>Manson v. Brathwaite</u>, 432 U.S. 98, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977)).

Here, these factors weigh in favor of the identification's reliability. First, the witnesses had a good opportunity to observe the man in their neighbor's house. According to their testimony, they had between 15 and 20 seconds to view the suspect from about 30 feet away with a light shining directly on the intruder's face. Madeline testified that she had a "clear view" into the house and David indicated that he got a "really good view." Furthermore, the circumstances suggest that David was paying strong attention to the intruder. He was standing outside using a flashlight to look into his neighbor's house <u>because</u> he knew an intruder was inside. He moved to a different area to get a better view into the house.

Next, the witness descriptions of Tlusty were substantially, though not entirely, accurate. Both testified that the person they saw was a light-skinned male wearing all black clothes and a black hat and carrying a dark-colored duffel bag. Officers responding to the scene had this description when searching the area. Tlusty matched that description, with the one exception that he was wearing a different shirt. Moreover, David, who had a brief verbal exchange with the intruder behind the house, heard Tlusty talking to officers and testified that he recognized the voice.

Neither witness expressed any uncertainty in Tlusty's identity as the man they had seen in Morrison's house. David demonstrated a high level of certainty when he testified he was "positive" Tlusty was the man from the house. Finally, the witness identification occurred shortly after David and Madeline saw the intruder inside Morrison's house.

Based on this record, Tlusty has not demonstrated that his counsel was deficient in failing to challenge the showup identification as impermissibly suggestive. The evidence weighed in favor of a contrary finding. It is thus unlikely the trial court would have granted any motion to exclude the showup identification. Tlusty's claim for ineffective assistance of counsel on this ground fails.

B.      Failure to Request a Dog Track Jury Instruction

Tlusty next challenges his trial counsel's failure to request a jury instruction advising the jury on the unreliability of dog tracking evidence.

Where the ineffective assistance of counsel is based on the failure of trial counsel to request a jury instruction, the court must find that the defendant was entitled to the instruction, that counsel's performance was deficient in failing to request it, and that the failure prejudiced the defendant. State v. Johnston, 143 Wn. App. 1, 21, 177 P.3d 1127 (2007).

In this case, Tlusty would have been entitled to an instruction informing the jury that it could not base a conviction on the dog track evidence alone. In State v. Loucks, 98 Wn.2d 563, 566, 656 P.2d 480 (1983), our Supreme Court held that a conviction cannot be based on dog track evidence alone; there must be corroborating evidence identifying the accused as the perpetrator of the crime. Because dog track evidence requires corroboration, a jury should be given a cautionary instruction pointing out that dog track evidence must be supported by other evidence. State v. Wagner, 36 Wn. App. 286, 288, 673 P.2d 638 (1983) (citing State v. Crouch, 60 Wn. 450, 111 P. 562 (1910)).

Even if it was deficient performance not to request this cautionary instruction, we cannot conclude the failure was prejudicial. Even with such an

instruction, a jury is permitted to consider dog track evidence. "[W]here abundant evidence corroborates dog tracking evidence, failure to provide the instruction is of minor significance." State v. Bockman, 37 Wn. App. 474, 484, 682 P.2d 925 (1984). The dog track evidence here was supported by overwhelming corroborating evidence identifying Tlusty as the perpetrator of the burglary. Two witnesses observed Tlusty inside the house and provided substantially accurate descriptions of him to police. Because he matched the description provided by the witnesses, Deputy Markholt detained Tlusty near the scene of the crime. The witnesses positively identified Tlusty as the man they saw in Morrison's house holding the duffel bags that had been found in the woods containing Morrison's belongings.

Because there was overwhelming evidence to establish Tlusty was the intruder inside Morrison's home, Tlusty cannot demonstrate that the result of the trial probably would have been different had counsel requested the dog track instruction. Accordingly, this claim for ineffective assistance of counsel also fails.

We affirm.

_Andrus, A.C.J._

WE CONCUR:

_Dwyer, J._          _Bowman, J._

- 10 -