[No. 6229-8-I.   Division One.   January 20, 1982.]

THE STATE OF WASHINGTON, *Respondent,* v. MARK
EDWIN COOK, *Appellant.*

166

*Mark Edwin Cook,* pro se, and *Wayne Lieb* of *Seattle–King County Public Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Michael Duggan, James Hoover,* and *Kurt P. Hermanns, Deputies,* for respondent.

DURHAM, A.C.J.—Mark Edwin Cook appeals his conviction of two counts of first degree assault[1] and one count of aiding a prisoner to escape, with special verdicts on each count finding that he was armed with a deadly weapon and a firearm. The charges stemmed from crimes committed during two separate but related incidents, a bank robbery and the escape of a prisoner from Seattle's Harborview

---

[1]The judgment and sentence and information herein incorrectly identified assault in the first degree as RCW 9.11.020 (Laws of 1909, ch. 249, § 162) instead of RCW 9.11.010 (Laws of 1909, ch. 249, § 161). In all other respects, however, the crime charged was correctly defined and instructed upon and we find no prejudice in this clerical error.

Hospital.

On January 23, 1976, at about 4:50 p.m., the Tukwila branch of the Pacific National Bank was robbed by four armed men. Three entered the bank: Bruce Seidel, Edward Mead, and John Sherman. Seidel was killed in the ensuing gunfire with police. Mead and Sherman were arrested at the bank.

The fourth man was stationed at a car across Interurban Avenue from the bank. After exchanging gunfire with police, this man fled in the car. A primary issue in this appeal is the procedures used by the police to identify the fourth man.[2]

Three people saw the fourth man. Officer Mathews, who exchanged gunfire with him, could only describe him as a black man driving a tan over brown Ford Granada. The other two witnesses gave more complete descriptions.

Jack Stockham, a retired Seattle police officer and owner of the tavern located next to the bank, heard shots about 4:50 p.m. on January 23. He went to the back door of the tavern and saw a man leaning over the top of a car parked across the street, firing at Officer Mathews who was crouched next to his car in the bank parking lot. Stockham saw the gunman clearly—there were no obstructions—for 5 or 6 seconds at a distance of 30 to 40 yards. He turned to go, then went back for a second look "to pick out some feature that I could recognize." Later he told police that he had seen a black man, 30 to 35 years old, 5 feet 10 inches tall, 170 pounds, with an unusual nose, short beard, and no glasses.

Several weeks later, Detective Conner showed Stockham a 6–picture photo montage without indicating who the police suspected. Stockham picked No. 3 (Cook) because it

[2]In 1976, Cook was convicted of federal bank robbery, conspiracy, and firearms violations arising out of the Tukwila incident. In his appeal, Cook raised exactly the same arguments regarding the identification procedures as he does here. The Ninth Circuit affirmed his conviction in an opinion consistent with our holding. *United States v. Cook*, 608 F.2d 1175 (9th Cir. 1979), *cert. denied*, 444 U.S. 1034, 62 L. Ed. 2d 670, 100 S. Ct. 706 (1980).

resembled the man he had seen. He then picked two other photos to illustrate the proper complexion since the quality of picture No. 3 was poor. Detective Conner said that Stockham was unable to clearly identify a suspect from the three pictures he chose.

Stockham was asked to attend a police lineup which was held March 15, 1976. He was shown six men, and he recognized position No. 3 (Cook) as the man he had seen at the robbery. He had no doubt about this identification. Stockham had conducted lineups himself and thought this lineup was a good one. He detected no apparent difference in age between the lineup subjects.

The other witness was 19–year–old Douglas Fluaitte, who was driving home from work on January 23 at 4:50 p.m. and stopped at an intersection across from the bank during the robbery. To his left, about 25 feet away, he saw a black man shooting at a policeman across the street. He described the man as 35 to 40 years old, 150 to 160 pounds, 5 feet 9 inches to 5 feet 10 inches, dark complexion, moderate afro hair style, no hat, long sideburns, and moustache. There was ample light for Fluaitte to see the man clearly and he observed him for about 1 minute. As the man drove away in his car, he came within 1 foot of Fluaitte's car.

On March 2, 1976, Detective Conner showed Fluaitte the same photos shown to Stockham, again without indicating who the police suspected. Fluaitte could not identify anyone from the pictures. Conner then pointed to the photo of Mark Cook and said, "This may be the man", but Fluaitte still could make no identification.

On March 15, 1976, Fluaitte attended a police lineup. From the six men in the lineup, he picked No. 3 (Cook) as resembling the man he saw at the robbery, but he made no positive identification. He stated that he remembered the robbery, not the photo he had been shown: "[the photo] had nothing to do with it. I was referring back to the robbery when I made my identification."

The second incident occurred on March 10, 1976 at Harborview Hospital. Officer Virgil Johnson, employed as a

court deputy for King County, had escorted John Sherman from the jail to the hospital to receive treatment for gunshot injuries sustained during the Tukwila bank robbery. As Johnson and Sherman crossed the parking lot to return to the van, Johnson saw a stranger in the parking lot. He described him as a black man, 5 feet 10 inches to 6 feet, 165 to 175 pounds, medium build, in his mid–30's, with afro–style hair, gray above one eye, a distinctive walk, wearing dark slacks, a white lab coat, and carrying a small black bag.

As Johnson entered the van, someone from behind said, "I'm taking your prisoner." Johnson turned and was hit by a bullet fired by the man who stood 8 inches away. Johnson fell, the bullet passing through him. Before he was shot he looked into the face of the man and saw that it was the same person he had just seen in the white lab coat. Johnson said the man's voice was calm and educated.

Johnson rolled away against another parked car and feigned dead, fearing another shot. Before closing his eyes, he again looked at the man for 5 or 6 seconds. Someone removed his gun, and then Johnson observed the assailant and Sherman walk away. Johnson managed to give a brief description of the man as he was wheeled to surgery.

Mark Cook was arrested about March 11, 1976. On March 15, 1976, Detective DePalmo and Officer Strunk showed Johnson a 7–picture photo montage in his hospital room. Johnson tentatively picked No. D (Cook) because it "looked a lot like" him, but he was not positive. He was then shown a color photo of Cook, which he recognized as being even more like the man in the parking lot, but he was not positive since he wanted to check other nonphotographic characteristics—the distinctive walk, the voice, the way he moved.

Johnson attended a 7–man lineup on May 6, 1976, and identified Cook. He had no doubt that Cook was the man, due to the distinctive walk and the voice. Johnson said that the photos he had previously seen did not influence him in his identification of Cook at the lineup.

Earnestine Sanders, a Harborview financial counselor, was returning from lunch on March 10, when she saw a "pretty attractive looking fellow" in a white coat and holding a bag. She thought he was perhaps a doctor, unusual since there are few black doctors at Harborview. She noticed a "very attractive hairdo, an Afro with some pretty gray in it." She came within 3 or 4 feet of him. Curious, she passed him again on her way to the gift shop, and tried to spot his name tag and necktie, required of doctors, but did not see any. She passed him again on her return to her office. She described a black man, 5 feet 7 inches to 5 feet 9 inches tall, 150 to 180 pounds, in his late 30's or early 40's, a "pretty black Afro, all gray in it," a "distinguished looking forehead" and "broad nose and piercing eyes."

After learning of the shooting in the parking lot, Sanders spoke with Johnson in his hospital room on March 15, indicating that she had seen a suspicious person immediately before the shooting. Later that day, DePalmo and Strunk showed Sanders the same photo montage shown to Johnson. She picked Cook's picture "because it looked like the person I saw in the hospital." She was then shown a color photo of Cook, which she recognized as "[t]he same person just in color."

Sanders attended the lineup on May 6, 1976. She recognized the man in position No. 5 (Cook) as the man she saw at the hospital. She was sure of her identification because she remembered him as an attractive looking man. The photos she had seen did not influence her: "No, I remembered the man—the body."

The eyewitness identifications were corroborated by Autry Stirgus, Jr., a long–time friend of Cook. Stirgus testified that in late January 1976, he and Cook drove to the scene of the Tukwila robbery where Cook described the events of January 23 in detail. Stirgus said that Cook told him that he was the backup man, had fired on police, then had sped away in the car. Cook also told Stirgus that he cut his hair and beard after the robbery to alter his appearance. Stirgus said that Cook and Seidel were friends.

Cook was charged with first degree assault in connection with the bank robbery (count 1), first degree assault in connection with the shooting of Virgil Johnson at Harborview (count 2), and aiding a prisoner to escape (count 3). He was charged with being armed with both a deadly weapon and a firearm in connection with all three counts. RCW 9.95.040, 9.41.025. After a 2-week trial which began on September 20, 1976, the jury returned a verdict of guilty on all counts.

Cook first assigns error to the denial of his motion to suppress the eyewitness identifications. He claims that the photo montages and the lineups were impermissibly suggestive and required suppression. According to Cook, the photo montage shown to Stockham and Fluaitte was suggestive because Cook's photograph was blurred and distorted. Two men were shown wearing sunglasses. When Fluaitte failed to identify any of the photos, Detective Conner pointed out Cook's picture. Similarly, Johnson and Sanders were shown a single color photo of Cook after they picked him from the montage. Cook also contends that the March 15 lineup was defective because Cook was older than the other men, and the subjects varied widely in height. Furthermore, a height discrepancy appeared in the May 6 lineup, and only Cook had a full afro and a full beard. Finally, Johnson knew that the other two men who arguably had afros (positions 1 and 3) were in jail when he was assaulted, thus eliminating them from consideration.

The test by which out-of-court identifications must be measured was given in *Simmons v. United States,* 390 U.S. 377, 19 L. Ed. 2d 1247, 88 S. Ct. 967 (1968). Each case must be considered on its own facts. An out-of-court identification is inadmissible if the identification procedure was so "impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons,* at 384. The inquiry ends if no suggestiveness is present, but even the use of suggestive procedures does not necessarily compel exclusion of the identification. Exclusion is required only where the suggestiveness results in a very

substantial likelihood of misidentification. Paramount in determining the likelihood of misidentification is the reliability of the witness' identification. *Manson v. Brathwaite,* 432 U.S. 98, 53 L. Ed. 2d 140, 97 S. Ct. 2243 (1977); *Neil v. Biggers,* 409 U.S. 188, 34 L. Ed. 2d 401, 93 S. Ct. 375 (1972). The appellate court must balance the reliability of the witness against the harm of the suggestiveness, considering the totality of the circumstances. The court should consider certain factors in this process, including (1) the opportunity of the victim to observe the subject at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior description, (4) the level of certainty at the confrontation, and (5) the length of time between the crime and the confrontation. *Manson v. Brathwaite, supra; Neil v. Biggers, supra; Solomon v. Smith,* 645 F.2d 1179 (2d Cir. 1981); *United States v. Field,* 625 F.2d 862 (9th Cir. 1980).

■ Washington courts have consistently used the *Simmons–Biggers* approach in identification cases. *State v. Hilliard,* 89 Wn.2d 430, 573 P.2d 22 (1977); *State v. Schultz,* 27 Wn. App. 722, 627 P.2d 107 (1980); *State v. Burrell,* 28 Wn. App. 606, 625 P.2d 726 (1981). In addition, our courts have upheld in–court identifications following arguably suggestive photo or lineup identifications so long as the in–court identifications have an "independent source." *State v. Hilliard, supra; State v. Hewett,* 86 Wn.2d 487, 545 P.2d 1201 (1976).

Cook stresses the suggestiveness of the procedures used in the case now before us. We agree that the techniques used by police here were not entirely without suggestion. However, we must also determine if the suggestiveness created a very substantial likelihood of misidentification. *Simmons v. United States, supra; State v. Hilliard, supra.*

To test the reliability of the identifications we must consider the factors outlined above. All four witnesses had good opportunity to observe the subject carefully, with full attention. Stockham came back for a second, and Sanders for a third look. All four gave fairly accurate and consistent

initial descriptions. As for level of certainty, three witnesses made certain, positive identifications of Cook. Fluaitte only made a tentative identification at the lineup, stating that he was not absolutely certain. Finally, approximately 2 months passed between the incidents and the identifications. This is not an impermissibly long period. *Neil v. Biggers, supra* (7–month delay between incident and confrontation). We conclude that the identifications were sufficiently reliable.

The convictions also must stand under the "independent source" test. All four witnesses testified that their identifications of Cook at the lineups were based on their recollections of seeing him at the bank or the hospital, and that the photographs had no influence on their recognition. From the totality of the circumstances in this case, it appears that the evidence was properly presented to the jury for its evaluation of reliability. The facts do not support Cook's claim that his convictions must be reversed due to impermissibly suggestive identification procedures.

■ Cook also challenges the admissibility of the identifications by Johnson and Sanders because these witnesses were shown the photo montage after Cook was in custody. He relies on *State v. Thorkelson,* 25 Wn. App. 615, 611 P.2d 1278 (1980). We disagree. Photographic identification of an in–custody suspect does not trigger a per se rule of exclusion. *State v. Schultz, supra; State v. Burrell, supra; State v. Hoyt,* 29 Wn. App. 372, 628 P.2d 515 (1981).

Cook next assigns error to the trial court's refusal to permit an expert witness to answer hypothetical questions and address specific problems. During trial, the court allowed Cook's witness, Dr. Elizabeth Loftus, an expert on eyewitness identification, to testify generally as to the factors affecting the reliability of such identifications. The court was concerned that any expert comment on specific facts through hypothetical questions would usurp the jury's function as fact finder. Cook argues that denial of hypothetical questions prevented the jury from understanding Loftus' evidence and denied Cook the benefit of the testi-

mony.

This court has twice before upheld the exclusion of Dr. Loftus' testimony on eyewitness identification. *State v. Barry,* 25 Wn. App. 751, 611 P.2d 1262 (1980); *State v. Brown,* 17 Wn. App. 587, 564 P.2d 342 (1977). As stated in *Brown,*

> the admission or exclusion of opinion evidence is within the sound discretion of the trial court. . . . If the reasons for admitting or excluding the opinion evidence are both fairly debatable, the trial court's exercise of discretion will not be reversed on appeal.

*Brown,* at 596–97, quoting *Levea v. G.A. Gray Corp.,* 17 Wn. App. 214, 220–21, 562 P.2d 1276 (1977). The reasons for allowing or barring hypothetical questions or testimony concerning specific problems are fairly debatable in this case. The trial court did not abuse its discretion in excluding the testimony, particularly in light of the fact that the court went further here than the *Brown* or *Barry* courts by allowing Dr. Loftus to testify generally as to the factors affecting eyewitness reliability.

Cook next makes two assignments of error which relate to a note which appeared in Cook's jail cell shortly after trial. It purportedly implicated a certain Nathaniel Doyle, a/k/a Delgado, as the fourth man involved in the Tukwila bank robbery and in the Harborview shooting. Cook's subsequent motion for discovery regarding Doyle was granted, although Cook's counsel was ordered not to show Doyle's picture to anyone "without prior consultation with the Court." Cook's motion for a new trial, based on newly discovered evidence, was denied.

Cook first claims that the trial court's limitation on discovery denied him due process and effective assistance of counsel. We disagree. The court's ruling did not prevent Cook from displaying Doyle's photograph to anyone, including the Tukwila and Harborview witnesses. The court merely required Cook to receive permission first, due to the court's awareness of an ongoing investigation of the circumstances which led to Doyle's death. The record contains

no request by Cook or his counsel for such permission.

Cook also assigns error to the denial of his motion for a new trial, arguing that the new evidence regarding Doyle would have changed the result of a new trial.

█ A new trial may be granted on the basis of newly discovered evidence if (1) the evidence has been discovered since the trial, (2) it could not have been discovered before trial by the exercise of diligence, (3) it is material, (4) it is not merely cumulative or impeaching, and (5) it will probably change the result if a new trial is granted. *State v. Canaday,* 79 Wn.2d 647, 488 P.2d 1064 (1971), *vacated on other grounds,* 408 U.S. 940, 33 L. Ed. 2d 764, 92 S. Ct. 2878 (1972); *State v. Gibson,* 75 Wn.2d 174, 449 P.2d 692 (1969), *cert. denied,* 396 U.S. 1019, 24 L. Ed. 2d 511, 90 S. Ct. 587 (1970); *State v. Adams,* 181 Wash. 222, 43 P.2d 1 (1935); CrR 7.6(a)(3). Here, the court ruled that the new evidence failed to meet the last requirement. Denial of a motion for a new trial on such grounds is not reversible absent manifest abuse of discretion. *State v. Canaday, supra; State v. Hobbs,* 13 Wn. App. 866, 538 P.2d 838 (1975); *State v. Wicker,* 10 Wn. App. 905, 520 P.2d 1404 (1974). The court here did not abuse its discretion. It characterized the alleged connection of Doyle with Cook's case as "interesting coincidences" but failed to find enough substance as would probably change the result of the case. We find no error.

█ Cook next argues that the special verdicts under the deadly weapon and firearm statutes must be vacated because the jury was not instructed that it must find he was so armed beyond a reasonable doubt, relying upon *State v. Tongate,* 93 Wn.2d 751, 613 P.2d 121 (1980). We disagree. Unlike the situation in *Tongate,* it is undisputed that the gunman at the bank and the hospital possessed an actual firearm. Officer Mathews testified that he saw the man fire at him, could feel the bullets go by him, heard the shots, and saw muzzle flashes from the gun. Officer Johnson was seriously wounded by a bullet fired by the gunman at close range. Even if the trial court erred in failing to give the

*Tongate* instruction, the error was harmless beyond a reasonable doubt. Indeed, given these undisputed facts, the jury must have found that an actual gun was used. *State v. Hall,* 95 Wn.2d 536, 627 P.2d 101 (1981); *State v. Claborn,* 95 Wn.2d 629, 628 P.2d 467 (1981).

Cook also argues that the firearm statute, RCW 9.41.025, cannot apply to first degree assault since possession of a firearm is an element of the crime. *See State v. Workman,* 90 Wn.2d 443, 584 P.2d 382 (1978). The Supreme Court recently rejected this position in *State v. Adlington–Kelly,* 95 Wn.2d 917, 631 P.2d 954 (1981). The court held, after a review of the legislative histories of those portions of our criminal code which define the crimes of robbery and assault, that the enhancement provisions of the firearm statute do apply to the crime of first degree assault. The enhancement of Cook's sentence by both the firearm and the deadly weapon statutes must stand.

Finally, Cook raises several issues in his pro se brief. He first alleges that on March 10, 1976, after the shooting at Harborview, he was arrested by Seattle police without a warrant or probable cause. Several photographs were taken of him, but he was neither booked nor charged. After a few hours he was released, and arrested again several days later. Cook claims his first arrest and detention, and the photographing, constituted an unconstitutional search and seizure, contrary to the fourth amendment to the United States Constitution.

■ This court need not decide the constitutionality of the detention. It is established law that error predicated upon evidence allegedly obtained by an illegal search and seizure cannot be raised for the first time on appeal. *State v. Pinkerton,* 72 Wn.2d 898, 435 P.2d 661 (1967); *State v. Silvers,* 70 Wn.2d 430, 423 P.2d 539, *cert. denied,* 389 U.S. 871, 19 L. Ed. 2d 152, 88 S. Ct. 156 (1967), and cases cited therein. The record contains no indication that Cook ever raised this issue below, although he certainly had opportunity to do so. He is precluded from arguing it now on appeal.

Cook also challenges his conviction on the basis of alleged violations of his protection against double jeopardy. He first contends that he was subject to double jeopardy because he could be imprisoned in a state institution while serving a federal sentence, or in a federal institution serving his state sentence. Cook's reliance on the Western Interstate Corrections Compact, RCW 72.70.010 *et seq.*, is entirely misplaced, since that law concerns relations between different states only. We find no unfairness in the opportunity afforded Cook to serve part of his federal sentence in a state institution, and vice versa.

Cook also claims double jeopardy by virtue of an amended information, filed September 23, 1976, 1 day after the jury was impaneled. He claims that jeopardy attached under the first information when the jury was impaneled, and that filing an amended information thereafter put him twice in jeopardy for identical offenses.

Cook ignores CrR 2.1(d) which reads:

> The court may permit any information to be amended at any time before verdict or finding if substantial rights of the defendant are not prejudiced.

Cook's rights were not prejudiced. The amended information merely corrected the charging statute citation in count 3. It replaced the original information and there was no double jeopardy.

Cook next argues, in connection with count 3 of the amended information (aiding a prisoner to escape), that the State failed to prove an essential element of the charged crime, namely that an escape occurred according to the statutory definition of escape. Under the former criminal statute, escape was defined as "the unlawful departure of a prisoner from the custody of a penal or correctional institution of the state". Former RCW 9.31.005; Laws of 1955, ch. 320, § 1. Apparently, Cook's theory is that Sherman was not in the "custody of a penal or correctional institution" while being transported from Harborview to the jail. Since the charging statute referred to "escape," the State failed to prove that element. The charging statute read, in part:

> Every person who, with intent to effect or facilitate the escape of a prisoner, . . . shall . . . aid or assist a prisoner in escaping or attempting to escape from the lawful custody of a sheriff or other officer or person, shall be guilty of a felony . . .

Former RCW 9.31.020; Laws of 1909, ch. 249, § 91.

Again, we find no merit to this claim. Sherman was a prisoner of the King County jail during his March 10 visit to Harborview. The statute makes clear reference to escape "from the lawful custody" of an officer. The State presented evidence from which the jury could conclude beyond a reasonable doubt that Sherman escaped within the statutory definition.

■ Finally, Cook argues that the court had no jurisdiction to try him since the applicable charging statutes were repealed in 1976 before the State filed the amended information and all prosecution abated upon repeal. This argument fails in light of RCW 9A.04.010(3):

> The provisions of this title do not apply to or govern the construction of and punishment for any offense committed prior to July 1, 1976 . . . Such an offense must be construed and punished according to the provisions of law existing at the time of the commission thereof in the same manner as if this title had not been enacted.

Cook claims that a savings clause must be part of a repealing act, and the former RCW Title 9 was repealed by implication. Yet the unambiguous language of RCW 9A.04-.010(3) states that Cook could be prosecuted under the former criminal provisions as if the new criminal code had not been enacted. Although not part of a repealing act, the provision expresses the intent of the legislature and cannot be ignored.

The judgment and sentence is affirmed.

SWANSON and CORBETT, JJ., concur.

Reconsideration denied March 9, 1982.

Review denied by Supreme Court May 21, 1982.