[No. 13359-4-I.   Division One.   January 11, 1985.]

THE STATE OF WASHINGTON, *Respondent*, v. LELAND
ALFRED JORDAN, *Appellant*.

*Raymond H. Thoenig* and *James E. Lobsenz* of *Washington Appellate Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Katharine B. Wilcox, Deputy,* for respondent.

SCHOLFIELD, A.C.J.—Leland A. Jordan appeals his conviction for one count of attempted robbery in the first degree and three counts of robbery in the first degree, all while armed with a deadly weapon that was also a firearm. He alleges that the trial court erred (1) in failing to suppress witness identifications made of him at a pretrial lineup, (2) in excluding evidence concerning two counts of first degree robbery that were dismissed before trial, (3) in excluding the testimony of a defense expert witness, (4) in refusing to allow him to represent himself, and (5) in refus-

ing to suppress a gun found during a search of his car.

## FACTS

A rash of armed robberies occurred in Seattle in early July 1982. On July 3, at approximately 10 p.m., someone attempted to rob James Bernier when he stopped to use a cash machine. A few hours later, on July 4, someone robbed Jeffrey Carlson, Lori Steele and Mark Francis at the same cash machine. On the next day, July 5, Lloyd Dineen was robbed while working at a gas station. On July 7, at about 8 p.m., a Kentucky Fried Chicken restaurant was robbed. On the evening of July 13, another Kentucky Fried Chicken restaurant in Seattle was robbed.

On July 14, 1982, Seattle Police Department Officers Su and Kossian received a radio broadcast stating that two black men and one white woman, driving a 1972 beige and brown Cadillac, Washington license plate number IFJ 013, were wanted regarding the theft of a wallet that had occurred minutes earlier. The officers spotted and stopped the car. Jordan was driving, Lori Wiseman was in the front seat, and Donald Hunter was in the backseat. As Officer Kossian approached the car, he noticed Hunter remove his hands quickly from underneath a blue tote bag on the floor. All three occupants were removed from the car and Hunter and Jordan were handcuffed. Officer Kossian searched the passenger compartment of the car and found the stolen wallet under the blue tote bag, a knife, three purses, and a distinctive silver pistol, which was later identified by a number of witnesses at trial as being very similar to the one used in the rash of robberies.

When arrested on July 14, 1982, Jordan was not yet a suspect in the armed robberies; he was eventually released. A warrant for Jordan's arrest was issued on August 3, 1982, however, and he was arrested in Spokane on August 4, 1982.

A pretrial lineup was held on August 16, 1982. Nine witnesses from the five robberies attended the lineup. Four identified Jordan: Bernier, Carlson, Dineen and Vanetta

Willis, an employee of the Kentucky Fried Chicken restaurant robbed on July 7.

Jordan moved to suppress the lineup identifications and any subsequent in–court identifications made by lineup witnesses. Hearings were held on November 19 and 22, 1982. Janet Ainsworth, a staff attorney with Seattle–King County Public Defender, testified that she had been assigned to cover lineups conducted by the Seattle Police Department on August 16, 1982. She testified that her responsibilities included listening to the instructions given to the witnesses, examining the people selected to participate in the lineup, comparing the suspect with the other participants selected, making suggestions to enhance the fairness of the lineup procedure, and objecting to suggestive procedures. She testified that she had not been allowed to cover the witness preparation stage of the lineup held that day. On cross examination, she testified that the witness preparation stage had taken about 10 minutes and that she had observed the rest of the lineup procedure and did not recall anything objectionably suggestive.

Sergeant Charles Scheuffele testified that he had conducted the lineup on August 16, 1982. He testified that he had excluded an attorney from the witness preparation stage of the lineup procedure and that this was his normal practice. When asked why he normally excluded attorneys, he answered, "No particular reason." Sergeant Scheuffele testified that on August 16, 1982, he read standard instructions to the witnesses from a written form and made these additional comments:

> I told the witnesses in this case that they would not be criticized if they did not make a pick; that we would not send the wrong man to jail if they inadvertently picked the wrong man, that this was not the only evidence in the case, but that I wished for them to do the very best they could. That it was an important matter. And that was the additional instruction I gave them.

Vanetta Willis also testified. She testified that Sergeant Scheuffele had told the witnesses that "he wouldn't actu-

ally send anyone to jail if you did pick anybody if you weren't sure whether to pick him or not." She also testified that:

> [I]t wouldn't—if he would have said that it would bring the punishment upon somebody, that I don't think I would have picked anyone. It was what—was so hard to pick, because I didn't know whether I should pick or not because it looked a lot like him, but I just—I wouldn't have picked him anyway.
>
> . . .
>
> I picked because I thought I had to pick somebody.

On cross examination, Ms. Willis testified that she had talked with two other witnesses who had not chosen anyone at the lineup and that these discussions had cast doubt on whether she had picked the right person. At one point, she testified that she had felt she had to choose someone, and, later in her testimony, she stated that she had not been pressured. She testified:

> I don't know. I just felt that I had to make a pick. I understood that you didn't have to pick at all, but I felt that I had to pick because there was something—there was something about him that really—that really looked a lot like him and I guess I just went on and picked him.

The court denied the motion to suppress, stating that it had not heard persuasive evidence of any reasonable probability that the procedures improperly suggested the identification of Jordan. The court stated that Ms. Willis' testimony could be construed in a couple of different ways, but that it felt that the sum of it was that she knew that she did not have to pick anyone but felt drawn to select Jordan because he looked most like the person who had robbed her.

On March 29, 1983, defense counsel moved in limine to suppress the gun that had been seized in the warrantless search of Jordan's car. This motion was denied.

On April 4, 1983, defense counsel moved in limine to admit expert testimony from Dr. Elizabeth Loftus, a professor of psychology at the University of Washington. The court asked defense counsel whether Dr. Loftus would tes-

tify in general terms regarding the reliability of eyewitness identifications or with particularity concerning any of the State's witnesses. Defense counsel stated that her testimony would be in general terms. The court denied the motion.

Also on April 4, 1983, the State moved in limine to exclude any mention of the fact that two counts of robbery in the first degree against Jordan had been dismissed without prejudice by the State. Jordan argued that the evidence was relevant because five witnesses to the pretrial lineup had misidentified him as committing the two robberies. The court granted the motion to exclude the evidence.

Soon after the State initially filed charges against him, Jordan requested and received appointed counsel for his defense. On September 22, 1982, however, Jordan requested and received an order permitting him to represent himself, with his appointed counsel acting only as legal adviser. Jordan represented himself with a legal adviser at the pretrial hearings on November 19, 1982 and November 22, 1982. On December 20, 1982 and December 22, 1982, upon Jordan's request, orders were entered allowing Jordan's legal adviser to withdraw and substituting new appointed counsel. Jordan's new appointed counsel represented him at the pretrial hearings on March 29, 1983 and April 4, 1983. Jury selection took place on the afternoon of April 4, 1983 and the morning of April 5, 1983 and the first witness for the State was called on the afternoon of April 5, 1983. On the morning of April 6, 1983, Jordan requested to be allowed to represent himself. This request was denied.

In regard to the attempted robbery on July 3, 1982, James Bernier identified Jordan at trial and testified that he had identified Jordan at the pretrial lineup.

In regard to the July 4, 1982 robbery, Jeffrey Carlson identified Jordan at trial and testified that he had identified him at the pretrial lineup. Lori Steele and Mark Francis also identified Jordan at trial and testified that they had identified him before trial from a photograph of the lineup.

In regard to the July 5, 1982 robbery, Lloyd Dineen

identified Jordan at trial and testified that he had identified Jordan at the pretrial lineup.

In regard to the July 7, 1982 robbery, Vanetta Willis identified Jordan at trial and testified that she had identified him at the lineup. Cecilia Phelan, a manager of the Kentucky Fried Chicken restaurant, testified that she had identified Jordan from a photographic montage before trial, but could not identify him at trial.

In regard to the July 13, 1982 robbery, four witnesses testified. Two witnesses positively identified Jordan, one witness tentatively identified him and one witness could not make an identification.

The jury found Jordan guilty of the attempted robbery and all of the other robberies, except the robbery committed on July 7, 1982.

## Pretrial Lineup Identifications

Jordan contends that the trial court erred in failing to suppress his pretrial lineup identifications. He contends that the exclusion of his attorney from the 10–minute witness preparation period preceding the lineup violated his Sixth Amendment right to counsel under *United States v. Wade,* 388 U.S. 218, 18 L. Ed. 2d 1149, 87 S. Ct. 1926 (1967) and *Gilbert v. California,* 388 U.S. 263, 18 L. Ed. 2d 1178, 87 S. Ct. 1951 (1967). He argues that even though counsel was present at the actual lineup and observed no objectionable procedures, Sergeant Scheuffele's embellishment of the standard written instructions prejudiced him because it encouraged the witnesses to guess. He cites the testimony of Ms. Willis.

In *United States v. Wade, supra,* the Court held that a post–indictment lineup is a critical stage of a criminal proceeding at which an accused is guaranteed the right to counsel under the Sixth Amendment. The Court held that there is grave potential for prejudice to an accused in the pretrial lineup and that the presence of counsel is necessary to assure that the accused can reconstruct at trial any unfairness that occurred at the lineup and thereby mean-

ingfully cross–examine the witnesses against him. *Wade,* at 237. The Court emphasized that neither witnesses nor lineup participants were apt to be alert for conditions prejudicial to the accused and that, even if they were, it would probably be of little benefit to the accused because neither witnesses nor lineup participants were likely to be schooled in the detection of suggestive influences. *Wade,* at 230.

▌ The Court in *Wade* did not consider whether counsel is required at any stage of the lineup proceeding other than the actual physical confrontation between the accused and the witnesses. This court, however, has held that the Sixth Amendment right to counsel does not extend to a post–lineup interview between witnesses and the police. *State v. Favro,* 5 Wn. App. 311, 487 P.2d 261, *review denied,* 80 Wn.2d 1001 (1971), *cert. denied,* 405 U.S. 1040 (1972); *State v. Kimball,* 14 Wn. App. 951, 546 P.2d 1217 (1976). In *Favro,* the court considered whether the identification of the defendant outside the presence of his attorney, 15 minutes after the lineup, violated the right to counsel. The court held that the remedy for any misconduct in improperly assisting the witness in the identification was cross examination at trial and that "[t]he basis for the requirement of the presence of counsel is the *presence of the accused* when confronted by the witness or witnesses." *Favro,* at 314.[1]

We find no reason to distinguish a brief witness preparation stage before a lineup from an interview held between the witnesses and the police after a lineup. Any allegedly

---

[1]We note that every federal circuit that has considered the issue has held that the right to counsel does not extend beyond the actual physical confrontation between the accused and the witnesses to a post–lineup interview. *Hallmark v. Cartwright,* 742 F.2d 584, 585 (10th Cir. 1984); *United States v. White,* 617 F.2d 1131, 1135 (5th Cir. 1980) (citing *United States v. Banks,* 485 F.2d 545, 548 (5th Cir. 1973), *cert. denied,* 416 U.S. 987 (1974)); *United States v. Bierey,* 588 F.2d 620, 624 (8th Cir. 1978), *cert. denied,* 440 U.S. 927 (1979); *United States v. Tolliver,* 569 F.2d 724, 727 (2d Cir. 1978); *United States v. Parker,* 549 F.2d 1217, 1223 (9th Cir.), *cert. denied,* 430 U.S. 971 (1977) (citing *Doss v. United States,* 431 F.2d 601, 603–04 (9th Cir. 1970)); *United States v. Wilcox,* 507 F.2d 364, 370 (4th Cir. 1974), *cert. denied,* 420 U.S. 979 (1975).

improper verbal suggestions made at the witness preparation stage could have been, and were, recalled by the witnesses on cross examination at trial. We hold that Jordan's Sixth Amendment right to counsel was not violated.[2]

### ALLEGED MISIDENTIFICATION EVIDENCE

Jordan contends that the trial court erred in excluding evidence that a number of lineup witnesses identified him as committing two armed robberies in Seattle, one on July 29, 1982 and another on July 31, 1982, when, in fact, he was in Spokane.[3]

On October 7, 1982, the State filed a second amended information charging Jordan not only with the one count of attempted first degree robbery and four counts of first degree robbery eventually tried, but also with two additional counts of first degree robbery. One count charged Jordan with committing an armed robbery on July 29, 1982 and the other count charged him with committing an armed robbery with an accomplice on July 31, 1982. The State voluntarily dismissed these counts without prejudice after Jordan presented copies of records from a Spokane hospital showing that he had been a patient on July 28, 1982 and July 29, 1982, and that he had checked into the hospital on two occasions for approximately 1 hour each on July 31, 1982. Although the State voluntarily dismissed the counts, it was not convinced that Jordan could not have traveled back and forth between the two cities. The trial court ruled that the evidence of alleged misidentification was not

---

[2]Although we hold that the right to counsel was not violated, we do not wish to condone the conduct involved. The State has provided no reason why counsel should be excluded from the witness preparation stage of a pretrial lineup.

[3]Jordan contended at trial and contends on appeal that five lineup witnesses allegedly misidentified him. However, the exact number cannot be determined from the record. Seattle Police Department Detective Vanderlaan testified that 33 witnesses observed the lineup, that 11 witnesses made identifications of three different suspects, and that of the 9 witnesses present regarding the five counts of robbery charged, 4 witnesses made identifications—all of Jordan. Thus, it is not clear how many of the other seven witnesses who identified suspects identified Jordan regarding the robberies on July 29, 1982 and July 31, 1982.

admissible after Jordan conceded that he had no independent evidence that a "lookalike" robber existed. The court ruled that the evidence either was not relevant or, even if it were, its admission would disrupt the trial because two additional counts of robbery would in effect have to be tried.

Jordan contends that the evidence of misidentification should have been admitted because it was highly relevant. The determination of the relevancy of evidence lies within the discretion of the trial court. *State v. Schimmelpfennig,* 92 Wn.2d 95, 98, 594 P.2d 442 (1979). In addition, the trial court has wide discretion in balancing the probative value of evidence against its potential prejudicial impact under ER 403. *State v. Coe,* 101 Wn.2d 772, 782, 684 P.2d 668 (1984). We agree that the evidence was either not relevant or so minimally relevant that its probative value was substantially outweighed by the danger of confusing the issues and misleading the jury. If the trial court had admitted the alleged misidentification evidence, the State would have had to be allowed to show that Jordan could have indeed committed the robberies. Thus, two more robbery counts would have been tried. We hold that the trial court did not abuse its discretion in excluding the evidence.

Jordan next contends that the evidence of misidentification was admissible to disprove identity under ER 404(b).[4] Jordan did not raise this issue in the trial court, however. He argued only that the evidence was relevant to the reliability of the testimony of the lineup witnesses regarding the counts charged. An objection to the admission or exclusion of evidence based on relevance is insufficient to preserve appellate review based on ER 404(b). *State v. Platz,* 33 Wn. App. 345, 351, 655 P.2d 710 (1982),

---

[4]ER 404(b) provides:

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

*review denied,* 99 Wn.2d 1012 (1983). We hold that Jordan may not raise this issue for the first time on appeal.

Jordan next contends that prohibiting him from impeaching the four lineup identification witnesses with the evidence that other witnesses had misidentified him violated his Sixth Amendment right to confrontation.

We do not agree. The alleged misidentification evidence concerned the reliability of eyewitness identification in general. It was not relevant to the prejudice or bias of any of the State's witnesses in particular. Jordan fully cross–examined the witnesses against him. We hold that his right of confrontation was not violated.

Finally, Jordan contends that even if the trial court correctly excluded the alleged misidentification evidence, the State "opened the door" to the admission of this evidence by eliciting the testimony of Detective Vanderlaan. He argues that the trial court erred in refusing to allow him to cross–examine Detective Vanderlaan with the misidentification evidence.

Again, we do not agree. Detective Vanderlaan testified that three different suspects were selected by the 11 eyewitnesses who made identifications; therefore, the jury was never informed that the defendant had been identified regarding any other cases or regarding the two dismissed counts. The State did not "open the door" regarding the alleged misidentification and therefore the trial court properly excluded Jordan's cross examination of Detective Vanderlaan on this theory.

### SELF–REPRESENTATION

Jordan contends that the trial court erred in refusing to allow him to represent himself. He argues that the court's refusal violated his absolute right of self–representation under the sixth amendment to the United States Constitution and article 1, section 22 (amendment 10) to the Washington Constitution. He also argues that even if his right of self–representation ceased to be absolute after trial began, the trial court abused its discretion under the circum-

stances.

A criminal defendant's constitutionally protected right of self–representation is not absolute; it must be timely asserted. *In re Richardson,* 100 Wn.2d 669, 674, 675 P.2d 209 (1983) (citing *State v. Fritz,* 21 Wn. App. 354, 360–61, 365, 585 P.2d 173, 98 A.L.R.3d 1 (1978), *review denied,* 92 Wn.2d 1002 (1979)); *see State v. Garcia,* 92 Wn.2d 647, 655–56, 600 P.2d 1010 (1979) (dictum). Whether a demand for self–representation made during trial should be granted or denied rests largely within the informed discretion of the trial court. *Richardson,* at 674 (citing *Fritz,* at 360–61). Factors to be considered in assessing such a demand are:

> the quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay which might reasonably be expected to follow the granting of such a motion.

*Fritz,* at 363 (quoting *People v. Windham,* 19 Cal. 3d 121, 128–29, 560 P.2d 1187, 137 Cal. Rptr. 8 (1977)).

Jordan did not contend at trial and has not contended on appeal that his counsel's representation was deficient in any way. In fact, when asked by the trial judge why he now wanted to represent himself, Jordan replied that he was not dissatisfied with his counsel's representation. His only reasons for the request were that he felt that he had nothing to lose because of some of the court's rulings and that his counsel "has been approaching my witnesses", which was "not conducive to my best interests". After Jordan stated these reasons, the trial judge confirmed from Jordan that, before trial, Jordan had first demanded an attorney, had then demanded to represent himself, and then had again demanded an attorney. The trial judge then denied Jordan's request. We hold that the trial court did not abuse its discretion under these circumstances.

### Expert Witness Testimony

Jordan contends that the trial court abused its discretion

in excluding the testimony of Dr. Elizabeth Loftus on the general subject of the reliability of eyewitness identification.

■ This court has upheld a trial court's exclusion of Dr. Loftus' testimony on eyewitness identification on two prior occasions. *State v. Barry,* 25 Wn. App. 751, 611 P.2d 1262 (1980); *State v. Brown,* 17 Wn. App. 587, 564 P.2d 342 (1977). We have also upheld the trial court's refusal to permit Dr. Loftus to answer hypothetical questions and address specific problems regarding eyewitness identification. *State v. Cook,* 31 Wn. App. 165, 639 P.2d 863, *review denied,* 97 Wn.2d 1018 (1982). The issue raised by Jordan was specifically addressed in *State v. Barry, supra.* We follow *Barry* and hold that the trial court did not abuse its discretion in excluding the testimony of Dr. Loftus.

RETROACTIVITY

Jordan contends that the trial court erred in refusing to suppress the gun found during the warrantless search of the passenger compartment of his car on July 14, 1982. He argues that the search violated article 1, section 7 of the Washington Constitution, citing *State v. Ringer,* 100 Wn.2d 686, 674 P.2d 1240 (1983).

In *New York v. Belton,* 453 U.S. 454, 69 L. Ed. 2d 768, 101 S. Ct. 2860 (1981), the Supreme Court held that when an occupant of an automobile is subjected to a lawful custodial arrest, the passenger compartment of that automobile may be lawfully searched under the search incident to arrest exception to the warrant requirement of the Fourth Amendment. The trial court expressly relied upon *Belton* in denying Jordan's motion to suppress at the hearing held on March 29, 1983. In *State v. Ringer, supra,* the Washington Supreme Court refused to follow *Belton* and held that under article 1, section 7 of the Washington Constitution, an arresting officer may search only the person arrested and the area within that person's immediate control as a search incident to arrest. In this case, the passenger compartment was not an area within the immediate control of any of the

occupants of the car when it was searched by Officer Kossian. Officer Kossian testified at the suppression hearing that when he searched the car, both Jordan and Hunter had been handcuffed and were away from the car and Wiseman had been removed from the car and had been told to stand on the sidewalk. We hold that the search violated article 1, section 7 under *Ringer*. Because *Ringer* was decided after Jordan's conviction, we must decide whether it should be retroactively applied.[5]

■■ Under traditional retroactivity analysis, three factors are to be balanced to determine whether a new constitutional rule should be retroactively applied:

> (a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards.

*Stovall v. Denno,* 388 U.S. 293, 297, 18 L. Ed. 2d 1199, 87 S. Ct. 1967 (1967); *see Solem v. Stumes,* __ U.S. __, 79 L. Ed. 2d 579, 104 S. Ct. 1338 (1984); *In re Gunter,* 102 Wn.2d 769, 689 P.2d 1074 (1984).

In the Fourth Amendment area, however, the Supreme Court has adopted a new approach. In *United States v. Johnson,* 457 U.S. 537, 73 L. Ed. 2d 202, 102 S. Ct. 2579 (1982), the Court held that unless a decision construing the Fourth Amendment is clearly controlled by an existing retroactivity precedent, it is to be applied retroactively to all cases in which the conviction was not yet final at the time the decision was handed down. The Court in *Johnson* reexamined its existing retroactivity precedents and determined that traditional retroactivity analysis was controlling in three narrow categories of cases: (1) cases in which the Court merely applied settled precedents to new and different factual situations, (2) cases in which the Court declared a rule of criminal procedure to be "a clear break with the

---

[5]The State does not contend that the search was valid under *State v. Ringer,* 100 Wn.2d 686, 674 P.2d 1240 (1983); it contends only that *Ringer* should not be retroactively applied. *See* Brief of Respondent, at 37–44.

past", and (3) cases in which the Court ruled that the trial court lacked authority to convict or punish the criminal defendant in the first instance. *Johnson,* at 548–51.

The Court in *Johnson* described the category of cases in which the Court declared a rule of criminal procedure to be "a clear break with the past" as follows:

> In general, the Court has not subsequently read a decision to work a "sharp break in the web of the law," unless that ruling caused "such an abrupt and fundamental shift in doctrine as to constitute an entirely new rule which in effect replaced an older one". Such a break has been recognized only when a decision explicitly overrules a past precedent of this Court, or disapproves a practice this Court arguably has sanctioned in prior cases, or overturns a longstanding and widespread practice to which this Court has not spoken, but which a near–unanimous body of lower court authority has expressly approved.

(Citations omitted.) *Johnson,* at 551.

In *State v. Ringer, supra,* the court abruptly shifted from a reliance on federal precedent under the Fourth Amendment to an analysis under article 1, section 7 of the Washington Constitution. The court stated at page 697:

> In the years immediately following *Michaels [State v. Michaels,* 60 Wn.2d 638, 374 P.2d 989 (1962)] this court disregarded the plethora of cases interpreting Const. art. 1, § 7 and began instead to rely on federal cases interpreting U.S. Const. amend. 4.

The court also stated that in the 17 years from the decision in *Preston v. United States,* 376 U.S. 364, 11 L. Ed. 2d 777, 84 S. Ct. 881 (1964) until *New York v. Belton, supra,* was decided,

> we neglected our own state constitution to focus instead on protections provided by U.S. Const. amend. 4.
>
> We choose now to return to the protections of our own constitution and to interpret them consistent with their common law beginnings.

*Ringer,* at 699.

The court in *Ringer* also explicitly overruled six prior cases that had improperly interpreted article 1, section 7 to

allow expansion of the search incident to arrest exception. The court stated:

Washington courts had allowed the scope of the search incident to arrest exception to Const. art. 1, § 7 to exceed by far any historical justification or precedent.

*Ringer,* at 694–95. Choosing to return to early interpretations of the search incident to arrest exception under article 1, section 7 necessitated overruling cases decided from 1923 until 1960 that were inconsistent with this interpretation of article 1, section 7. We hold that the decision in *Ringer* constitutes "a clear break with the past" because the court abruptly shifted to an analysis under article 1, section 7 of our constitution and explicitly overruled a number of prior cases improperly interpreting the scope of the search incident to arrest exception under article 1, section 7.

A decision that constitutes "a clear break with the past" "almost invariably" will not be given retroactive effect. *United States v. Johnson,* 457 U.S. at 549. *See United States v. Peltier,* 422 U.S. 531, 547 n.5, 45 L. Ed. 2d 374, 95 S. Ct. 2313 (1975) (Brennan, J., dissenting) (collecting cases). In *Johnson,* the Court concluded:

Once the Court has found that the new rule was unanticipated, the second and third *Stovall* factors—reliance by law enforcement authorities on the old standards and effect on the administration of justice of a retroactive application of the new rule—have virtually compelled a finding of nonretroactivity.

*Johnson,* at 549–50. *See State v. Rhoads,* 101 Wn.2d 529, 681 P.2d 841 (1984) (denying retroactive application to *State v. Jones,* 101 Wn.2d 113, 677 P.2d 131 (1984) because it constituted "a clear break with the past" and trial courts and the Court of Appeals had justifiably relied upon a statement in an earlier decision). We conclude that the second and third *Stovall* factors compel nonretroactivity in this case as well.

*New York v. Belton, supra,* was decided slightly more than 1 year before the search of the passenger compartment of Jordan's car. *Belton* was expressly relied upon by this

Division of the Court of Appeals in upholding the search of the glove compartment of the defendant's car in *State v. Callahan,* 31 Wn. App. 710, 644 P.2d 735 (1982). *Callahan* was decided just 2 months before the search of Jordan's car. In *Callahan,* the court also held that the search did not violate article 1, section 7, expressly relying upon *State v. Smith,* 88 Wn.2d 127, 559 P.2d 970, *cert. denied,* 434 U.S. 876 (1977), in which the Washington Supreme Court held:

> It is apparent that the fourth amendment to the United States Constitution and article 1, section 7 of the Washington State Constitution are comparable and are to be given comparable constitutional interpretation and effect.

*Callahan,* at 714. We hold that law enforcement authorities justifiably relied upon *Belton* and *Callahan* and the numerous prior cases based on federal precedent under the Fourth Amendment in defining the scope of a search incident to arrest exception under article 1, section 7.

We also find that the retroactive application of the rule announced in *Ringer* would have a disruptive effect on the administration of justice. We have no reason to doubt that numerous convictions were obtained in part by the use of evidence seized under the authority of *Belton.* The investigation, and possible retrial, of these cases would be difficult and time consuming. *See, e.g., Solem v. Stumes,* 104 S. Ct. at 1345; *Desist v. United States,* 394 U.S. 244, 251, 22 L. Ed. 2d 248, 89 S. Ct. 1030 (1969). We hold that *State v. Ringer* is not to be retroactively applied.[6]

---

[6]Our Supreme Court very recently held that *Payton v. New York,* 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371 (1980) should not be retroactively applied to cases on collateral review. *In re Sauve,* 103 Wn.2d 322, 692 P.2d 818 (1985). We find that the court's analysis supports our decision in this case.

The court in *Sauve* applied what we have labeled "traditional retroactivity analysis"—it balanced the three factors set forth in *Stovall v. Denno,* 388 U.S. 293, 18 L. Ed. 2d 1199, 87 S. Ct. 1967 (1967). The court held that the purpose of the rule announced in *Payton* "strongly supports prospectivity" because the rule was designed to deter illegal police action and was not designed to enhance the integrity and reliability of the fact–finding process. *Sauve,* at 328. The court also held that "it would be unreasonable to expect law enforcement authorities to have foreseen the bright line rule drawn in *Payton* prior to its announcement." *Sauve,*

Judgment affirmed.

DURHAM, J., concurs.

RINGOLD, J. (dissenting)—I respectfully disagree with the majority's refusal to apply the holding of *State v. Ringer*, 100 Wn.2d 686, 674 P.2d 1240 (1983) to the case sub judice. The majority overemphasizes federal case law. Instead, we should consider prior state law, the effects of retroactivity on the administration of justice, and the importance of treating litigants fairly and equally.

The majority correctly states that the retroactivity issue should be analyzed under *United States v. Johnson*, 457 U.S. 537, 73 L. Ed. 2d 202, 102 S. Ct. 2579 (1982). *Ringer* may be considered as a "category 2" case because it breaks with prior precedent. The next step, however, is not denial of the applicability of *Ringer*, but careful consideration of the following factors:

> (1) The purpose of the new rule and whether retroactive application of the rule would effectively serve that purpose; (2) whether and to what extent law enforcement agencies, including courts, justifiably relied upon the preexisting rule; and (3) the effect of retroactive application upon the administration of justice including . . . the availability of remedies to correct the deficiencies aimed at by the new rule . . .

*Brumley v. Charles R. Denney Juvenile Ctr.*, 77 Wn.2d 702, 707, 466 P.2d 481 (1970). *See also Stovall v. Denno*, 388 U.S. 293, 18 L. Ed. 2d 1199, 87 S. Ct. 1967 (1967).

Although *Ringer* may be a "break with precedent," the sharpness of that break is blunted by earlier cases stating that article 1, section 7 of our constitution is more protective of individual rights than is the Fourth Amendment.

---

at 329.

The purpose of the rule announced in *State v. Ringer*, 100 Wn.2d 686, 674 P.2d 1240 (1983) also was to deter illegal police action and not to enhance the integrity and reliability of the fact–finding process. In addition, if it would be unreasonable to expect law enforcement authorities to have foreseen the bright line rule drawn in *Payton*, it certainly would be so regarding *Ringer*, which constituted "a clear break with the past."

The majority's reliance on *State v. Callahan*, 31 Wn. App. 710, 644 P.2d 735 (1982) is misplaced. *State v. Simpson*, 95 Wn.2d 170, 177–78, 622 P.2d 1199 (1980) stated in part:

> The language of the search and seizure provision of our state constitution, Const. art. 1, § 7, differs significantly from the fourth amendment . . .
>
> Historical evidence reveals that the framers of the Washington Constitution intended to establish a search and seizure provision that varied from the federal provision. . . .
>
> . . . there is precedent for interpreting this particular language in a state constitution as conferring upon a defendant a higher degree of protection than is provided by the federal constitution. Const. art. 1, § 7 differs from the Fourth Amendment in that it clearly recognizes an individual's right to privacy with no express limitations.

The court went on to find that article 1, section 7 gives *automatic* standing to defendants charged with an offense that has possession as an element, in contradiction to standing for Fourth Amendment purposes. *Simpson*, at 182. The analysis in *Simpson*, and in *State v. Michaels*, 60 Wn.2d 638, 374 P.2d 989 (1962), limits the extent to which law enforcement officials could have relied on our state courts' automatic acceptance of federal Fourth Amendment cases. Additionally, *Ringer* itself classified its decision as a *return* to the correct interpretation of article 1, section 7, rather than an entirely new rule. *Ringer*, at 699.

This is a factor to weigh in the balancing process. Another factor is "the effect of retroactive application upon the administration of justice . . ." *Brumley*, at 707. *In re Sauve*, 103 Wn.2d 322, 692 P.2d 818 (1985), cited by the majority, is not determinative because the situation here is far different than that in *Sauve*. We are not presented here with a collateral attack on a conviction, but with a case still in the pipeline of appeal. As noted in *Sauve*, "the retroactive application of a new constitutional principle will depend on whether the case is on direct appeal or collateral

review." *Sauve,* at 328. The majority concludes that investigation and retrial of all the cases decided under *New York v. Belton,* 453 U.S. 454, 69 L. Ed. 2d 768, 101 S. Ct. 2860 (1981) "would be difficult and time consuming." I agree. Such is not, however, the issue presented here. Jordan's case is still in the pipeline of appeal. Granting limited retroactivity to cases still on appeal when *Ringer* was decided does not put an undue burden on the administrative and judicial processes, especially when considered in light of the high importance placed on Fourth Amendment rights, and the absence of any other remedy for this violation of those rights.

Refusal to grant even limited retroactivity may violate the judicial responsibility "'to do justice to each litigant on the merits of his own case.'" *State v. Pam,* 98 Wn.2d 748, 757, 659 P.2d 454 (1983). Similarly situated defendants are not treated alike when retroactivity is denied. Allowing the decision to apply to all cases still on direct appeal when the decision is handed down, "provides a principle of decision-making consonant with the reasoning that all newly declared constitutional rules of criminal procedure should apply retrospectively to all convictions not yet final when the rule was established." *Pam,* at 757. As the Supreme Court pointed out in *Johnson,* retroactivity should not be denied simply because the rule had not yet been announced at the time of the defendant's arrest: the rule was not announced at the time of Ringer's arrest either, yet it applied to Ringer. *Johnson,* at 541.

Because *Ringer* represents a change in precedent, full retroactivity is not appropriate. Allowing retroactivity to cases still in the pipeline of appeal vindicates the rights of those whose convictions are not yet final without undue disruption of the "administration of justice," and without unduly disrupting the legitimate expectations of law enforcement officers. Balancing the three factors leads to

the conclusion that *Ringer* should apply to those cases not yet final when *Ringer* was decided. I would reverse.

Reconsideration denied February 11, 1985.

Review by Supreme Court pending July 1, 1985.