IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 31433-2-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TERREK TREMAIN CORBIN, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

FEARING, J. — Terrek Corbin challenges the sufficiency of evidence to convict

him of first degree felony murder, second degree assault, and first degree burglary. Each

charge arises from an occurrence on the night of October 24, 2010, at the Yakima home

of Mark Wallace, the victim of the murder. We hold that sufficient evidence supports

each charge, and we affirm all three convictions.

FACTS

Beginning in June 2010, Mark Wallace sold marijuana from his home at 1811

South 10th Avenue in Yakima. Mark lived in the home with his wife, Corey Wallace, his

stepdaughter, Tiffany Willy, and son, Brandon Wallace. Tiffany and Brandon had

separate bedrooms. Tiffany was 21 years old in October 2010, and her brother Brandon was 18.

Marijuana buyers sometimes phoned Mark Wallace and sometimes phoned Brandon to arrange a purchase. Mark delivered marijuana to some buyers, and other purchasers came to the Wallace home to consummate the purchase. Two of Mark's customers were African-American.

In July 2010, defendant Terrek Corbin, his girlfriend, Kathy Crawford, and the couple's months-old daughter moved to the residence of Lydia Cardenas near the corner of 1st Avenue and Nob Hill, Yakima. Host Cardenas soon began dating Corbin's cousin, Eric Graham, who also moved into the home. Corbin did not own a vehicle. Corbin regularly traveled to Seattle for music and to visit a friend.

On September 14, 2010, Terrek Corbin reported to his community corrections officer, Scott McLean. McLean photographed Corbin that day. The photo depicted Corbin, a Black man in his twenties, with an earring in his left ear, wearing a black and white checkered jacket with a fur hood.

According to Terrek Corbin, he remained at Lydia Cardenas' residence all day on the day of the crime, October 24, 2010. He smoked marijuana and watched movies with Cardenas, Kathy Crawford, and Eric Graham. At trial, Graham similarly testified that Corbin, Cardenas, Crawford, and he spent the day watching movies at Cardenas' home.

2

Graham testified he went to bed about 11:00 p.m., with Corbin then inside the Cardenas' home.

On October 24, 2010, approaching 11:00 p.m., Mark and Corey Wallace slept in their Yakima home. Tiffany Willy lay awake on her bed. Brandon Wallace played a video game in his room with a friend. Someone knocked on the door. The knocking awoke Mark and Corey. Brandon exited his room and answered the door, while his friend remained in the bedroom. The fireplace and a stove light provided scant light for Brandon. The porch light shone.

As Brandon Wallace opened the door, a gun greeted him. Brandon retreated from the door. Three men entered the home, with the first standing in front of the second and third man. The first man pointed a gun at Brandon and ordered him to the ground. At trial, Brandon described the gun as a black, semi-automatic handgun. The second and third men also carried rifles or shotguns. The first man pistol-whipped Brandon in the forehead. The young man's forehead sustained a gash and swelling.

From her and Mark Wallace's room, Corey heard a body hit the floor. Brandon called for his father. Mark exited his bedroom and exchanged words with the assailant who struck Brandon. Tiffany Willy exited her room to the hallway, where she witnessed the altercation by peeking around a bookshelf. The first man aimed his gun at Mark Wallace, who declared: "Nobody's going to take anything or do anything." Report of Proceedings (RP) at 462. Tiffany returned to her room and dialed 911.

3

The first intruder shot Mark Wallace in the chest, and the bullet passed through Mark's torso. Blood splattered the room. The three prowlers fled instantly without uttering a word.

Only Tiffany Willy, Brandon Wallace, and Mark Wallace saw the three trespassers. Tiffany did not recognize the men. Tiffany wore glasses when she testified at trial, but did not wear glasses that night. Tiffany did not see the race or hair color of any of the three intruders. According to Tiffany, each man wore a hooded sweater jacket with a hood. The clothing of the first intruder was blue with swirls. The two other prowlers wore black. At trial, Tiffany testified that the first man's jacket was not checkered and no one wore a baseball hat.

Like his half sister, Brandon Wallace did not recognize any of the three intruders. The dim lighting precluded seeing most details, but Brandon testified at trial to some particulars. According to Brandon, the shooter sported a black bandana over his mouth and nose and wore a hooded jacket. Brandon described the jacket as black "with some kind of designs on the sleeve," "[l]ike swirls or just lines" that were "either white or light blue or yellow." RP at 460. The jacket was not checkered. According to Brandon, the second intruder also wore a black bandana. Brandon Wallace identified the race of the first and second man as Black. The third man, Brandon testified, wore a pig or wolf Halloween mask. Brandon also testified that none of the three intruders wore a baseball hat. At trial, Brandon denied having smoked marijuana that night.

4

Police and paramedics responded to the Wallace home. One officer smelled freshly burnt marijuana inside the home. Near the home's door, police found the deadly bullet and its spent shell casing. City of Yakima Police Department Forensic Lab Supervisor Kristen Drury testified at trial that the fired bullet had the rifling characteristics of being shot from a Hi-Point firearm.

Mark Wallace remained conscious while transported by ambulance to the hospital. Forty-five minutes into surgery Mark Wallace perished from blood loss.

The following day, October 25, 2010, between 8:00 and 9:00 a.m., Eric Graham awoke at Lydia Cardenas' home and saw Terrek Corbin. Corbin left the residence shortly thereafter. According to Graham, Corbin carried nothing when he left that morning. Corbin did not return, but rather abandoned his few belongings at Cardenas' apartment.

On October 25, 2010 beginning at 8:00 a.m., Richard Klise labored as a janitor at Southeast Community Center, in Yakima. Southeast Community Center is about one mile from Lydia Cardenas' home and across the street from Corbin's grandparents' house. Between 8:30 and 9:00 a.m., Klise took trash to the center's garbage dumpsters. At trial Klise testified that, when he lifted the left hand cover to the dumpster, he saw a brand new coat in the right side of the dumpster. He deposited the garbage in the dumpster's left half and then lifted the right side cover. He also spotted a hat and a gun near the coat. The jacket, baseball hat, and gun sat atop, not buried in, the trash. Klise

5

described the jacket as "brand new" and black and white. RP at 623.

Richard Klise and his employment supervisor removed the jacket, gun, and baseball hat from the dumpster. One of the two used the hat or jacket to remove the gun without leaving fingerprints. City of Yakima police arrived and deposited the jacket, hat, and gun into evidence bags.

Between 9:00 and 10:00 a.m. on October 25, Roger Williams saw Terrek Corbin sitting on stairs along Fair and Arlington Streets in Yakima. Williams is the husband of Corbin's female cousin. From there, Corbin journeyed to Seattle.

On October 26, 2010, Community Corrections Officer Scott McLean saw police officers reviewing a white and gray checked coat at the Yakima Police Department. McLean recognized the coat as the jacket Terrek Corbin wore in the September 14, 2010 photograph. He showed other officers the photograph.

At trial, Forensic Lab Supervisor Kristen Drury identified the gun found in the Southeast Community Center dumpster as a 9mm Luger Hi-Point. Drury recovered no fingerprints from the gun. Washington State Patrol Forensic Scientist Kathy Geil examined the gun and compared the firearm to the bullet and fired casing found at the Wallace home. Through ballistics testing, Geil concluded that both the bullet and casing came from the gun Richard Klise found alongside the jacket and hat in the trash dumpster.

On a date not shown in the record, King County law enforcement officers arrested

Terrek Corbin on a warrant unrelated to the killing of Mark Wallace. Yakima police later transported Corbin to Yakima, where, on December 15, 2010, he assented to a custodial interview with City of Yakima Detective Gonzalo Deloza. During the interview, Corbin denied any involvement in or knowledge of the shooting of Mark Wallace. When asked to disclose his location on October 24, Corbin responded he smoked marijuana and watched movies at Lydia Cardenas' home. He claimed to have remained inside Cardenas' home all of October 24 and 25 because law enforcement had a warrant for his arrest.

During the December 15 interview, Detective Gonzola Deloza disclosed that a family member saw Corbin near Fiesta Foods on October 25. Corbin responded:

> To my knowledge of what I remember, I was there all day. The most I ever pretty much did is go and buy some beer and buy some weed, so I mean, I, I'll be honest with you, I don't remember leaving but if I did it wouldn't be a surprise, you know what I mean, but I remember being there.

Exhibit (Ex.) 257 at 29.

During the December 15 interview, Detective Gonzalo Deloza showed Terrek Corbin the September 14, 2010 photograph taken by Scott McLean. Deloza asked Corbin about the jacket. Corbin admitted, "Yeah, that's my jacket," referencing the photo, but claimed to have not seen the jacket for some time. Ex. 257 at 8-10. Detective Deloza told Corbin that police recovered a gun and jacket related to a homicide. Corbin responded:

7

Exactly what you're telling me is by those things you're telling me that you found the gun and you found something over there that I was wearing on there.

Q. [Det. Deloza] Um-hum.

A. [Corbin] Okay. And that's very possible that you probably found something that I might have wore, I don't know. But what I do know is I haven't had that jacket for quite some time.

Q. Um. .

A. And so anyone of my, me and my friends, we all wear the same shit though. Anyone of my friends could have take and wore my jacket.

. . . .

Q. Okay. Would your DNA [deoxyribonucleic acid] be on, on the jacket that we recovered?

A. If ah, if that's the same jacket that I had and somebody wore it to work or went and committed crimes, that's very possible. People do that all the time.

Ex. 257 at 9-10.

During the December 15 interview, Corbin repeatedly told Detective Gonzola Deloza that someone must have taken his jacket.

Q. When's the last time you seen your jacket?

A. And that jacket?

Q. Yeah. Give me, give me about. .

A. Oh, man, at least a year and a half or two.

Q. Well, you, you told me you take the picture in, in um, September?

A. I took that picture in '08. That's a jacket from 2008.

Q. This is not the picture that, that Scott took September?

A. Let me see. Yeah, it is, yeah, it is, you're right, you're right, that is the one, one in September.

Q. Okay.

A. Yeah, you're right.

Q. And when ah, when's the last time you saw that jacket?

A. The last time I saw that jacket, that looks like the same picture I took when I got out kinda um, chu . . . when's the last time I seen that jacket? Probably like right around that time in September.

8

Q. September, okay.
A. Around that time.
Q. Okay.
A. Cause that was during the same time that I had my stuff in my partner's house and his place got robbed.

Ex. 257 at 21. Later in the interview, Corbin again admitted: "I have a jacket, I had a jacket that looked exactly like that." Ex. 257 at 34.

Terrek Corbin told Gonzola Deloza during the police interview: "One thing I can tell you for certain right now that you will not find nothin' on any gun that belongs to me. That's what I know for absolute sure." Ex. 257 at 34. Corbin continued, "All those aside but all that other stuff, guns and *masks* or *gloves* or anything of that nature, I'm ah, I don't, know what I'm sayin." Ex. 257 at 34 (emphasis added). The interview then ended. Deloza had not previously mentioned the Halloween mask or gloves.

Terrek Corbin volunteered a DNA sample. Jennifer Dahlberg, a Washington State Patrol crime lab forensic scientist, performed the various DNA analyses for this case. Dahlberg testified at trial that she can distinguish one person's DNA from another person's DNA. The only exception to this capability is the DNA of identical twins. According to Dahlberg, the veracity of DNA analysis decreases significantly if more than one person contributes to a sample. Dahlberg collected DNA samples from Terrek Corbin, Mark Wallace, and Eric Graham.

When examining the jacket found in Southeast Community Center garbage dumpster, Jennifer Dahlberg discovered a black bandana in one of its pockets. She

9

collected DNA from the gun, jacket, bandana, and hat, which she then compared to the DNA samples from Terrek Corbin, Mark Wallace, and Eric Graham. Dahlberg did not find sufficient DNA on the gun to perform a DNA analysis. Dahlberg collected sixteen picograms of DNA from the cuffs and collar of the jacket. This sample was also too small to perform an analysis and to conclude from whom the DNA came. Dahlberg found DNA in a blood stain on the left sleeve of the jacket. Dahlberg concluded that the DNA came from one male, but excluded Corbin, Wallace, and Graham as the possible contributor.

Jennifer Dahlberg gathered sufficient DNA from the hat found in the dumpster and the bandana found in the jacket. Both tests inculpated Terrek Corbin. Dahlberg found the DNA of at least three people on the bandana. Dahlberg concluded that one in three Americans could have been a contributor. Terrek Corbin was a possible contributor, but Eric Graham and Mark Wallace were not. From the hat, Dahlberg discovered DNA from a single source. The DNA from the hat exactly matched Terrek Corbin's DNA. Dahlberg testified, "The estimate of probability of selecting an unrelated individual at random from the U.S. population with a matching profile to the one I obtained from the cap would be 1 in 12 trillion." RP at 699.

## PROCEDURE

On May 25, 2011, the State of Washington charged Terrek Corbin with six counts: (1) first degree murder of Mark Wallace with premeditated intent, (2) second degree

10

assault of Brandon Wallace, (3) first degree burglary based on the assault of Brandon

Wallace, (4) attempted first degree robbery of Brandon Wallace, (5) attempted first

degree robbery of Corey Wallace, and (6) attempted first degree robbery of Tiffany

Willy. On June 6, 2011, the State amended its information to base the first degree

murder charge on the contemporaneous commission of a felony rather than

premeditation. The State identified the underlying felony as either first degree burglary

or any of the attempted first degree robbery counts.

During his incarceration awaiting trial, Terrek Corbin placed multiple calls from

the Yakima County Jail. The jail recorded the calls and the State played some of the

recordings to the jury. Each prisoner at Yakima County Jail received a unique pin

number to call from the jail. Nevertheless, the phone system did not allow a call to

proceed until the system recognized the voice of the inmate to whom the pin number was

assigned. Jail Sergeant Jeremy Welch testified at trial, however, that an inmate could

initiate a call, speak until the phone system recognized his voice, and then hand the phone

to someone else to talk.

On May 26, 2011, using another inmate's pin number, Terrek Corbin phoned a

male named Harley. That conversation, which the jury heard, included this colloquy:

> TC [Terrek Corbin]: Hey Harley what time is it? Ok yeah there's
> plenty of time cuz I don't want no excuses or all you [racial slur] are
> getting checked when I get out.
> [MALE]: Ah you better have your bang if you try to check me.

11

TC: Oh you know I keep one (laughing) yeah that's the thing, one thing about me, one thing about Young T in this situation is I keep one.
MALE: So do I [racial slur] shit (laughing).
TC: yeah sometimes two (laughing)
MALE: Right on (laughing)
TC: Yeah top shot gots my back in full affect play time is over.
MALE: On everything, play time is over.

Ex. 292 at 1. "Bang" refers to a firearm. RP at 854.

On June 1, 2011, using another inmate's pin number, Terrek Corbin phoned

Zealand Adams. During the conversation, the two spoke:

Zealand Adams: [racial slur] is um cooperating?
Terrek Corbin: not that I know of if somebody, see that's the thing though remember just like I told you when (inaudible) there's a thing about that you know what I'm saying, if you do then that's like fucked up for the whole bunch, you spoil the whole bunch see what I'm saying[.]
ZA: Uh-huh (yes)
TC: So if they was then they definitely wouldn't have taken this long to file charges that's what they waiting for, somebody to do that, as of now they got my DNA.

Ex. 292 at 1.

On June 5, 2011, again from jail using another inmate's pin, Terrek Corbin phoned

someone. Corbin said:

And I understand that [racial slur], that's why I've been the front liner in this, the sacrificial person this whole time, [racial slur], like I got you [racial slur], don't worry about it [racial slur], shut the fuck up and go home [racial slur], I got this, matter of, watch out [racial slur], watch out [racial slur], give me the pistol, back up [racial slur], this ain't for you [racial slur], I'm that guy [racial slur].

Ex. 292 at 1.

12

On June 6, 2011, again from jail using another inmate's pin, Terrek Corbin called

Zealand Adams. The two spoke:

> Zealand Adams: (inaudible) weirdo boy, you better sign them
> continuances until we find out what's going on [racial slur].
> TC: I know what's going on.
> ZA: [Y]ou don't obviously if they got your fucking DNA idiot[.]
> TC: I been on that, and they told me that already.
> ZA: [O]kay I mean one thing, you need more time than 2 months
> [racial slur].
> TC: [F]or what, to sit in, for what they have everything that they are
> ever going to have, there's no witness point me out, so they have
> everything that they are ever going to have, the only way that. . .
> ZA: How do you know that, how you know that, you haven't read
> your discovery, how you know that Eric, or JC, or Little T ain't pointing
> you out?
> TC: See, see now you're tripping, I don't even know what . . .
> ZA: I mean I'm saying. . .
> TC: No, I don't understand that right there, right there, what you
> just did, I don't at all, please don't ever do that again. That's what I'm
> saying cuz, that's just fucking (inaudible). . .
> Male: I'm saying they have those people as mother fucking suspects
> as well dog it's all over the fucking news. Well I mean I'm serious [racial
> slur], they already took the [racial slur]s in for questioning do you feel me?
> TC: Well I'm still the only one here so obviously the questioning
> didn't go too far.

Ex. 292 at 2.

On August 9, 2011, again from jail using another inmate's pin, Terrek Corbin

phoned someone. Corbin uttered: "They fear me in the streets because I'm here with a

pistol, and I ain't never been afraid of no contract killer, been hitting licks, you better ask

about cuz, I jack you and I sell it right back to your bloods." Ex. 292 at 2.

13

Trial occurred November 6 through 26, 2012. The trial court instructed the jury on accomplice liability. 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL § 10.51, at 217 (3d ed. 2008) (WPIC). The trial court instructed the jury, "If one participant in a crime is armed with a firearm, all accomplices to that participant are deemed to be so armed, even if only one firearm is involved." Clerk's Papers (CP) at 177. Under the to-convict instructions for each of the six counts, the jury could find Terrek Corbin guilty as a principal or accomplice. The trial court also instructed the jury on the difference between direct and circumstantial evidence. WPIC § 5.01, at 170.

The jury began deliberations on November 21, 2012. At its own request, the jury reheard Terrek Corbin's custodial interview and the jail phone calls. On November 26, at its own request, the jury again listened to Corbin's jail phone calls. The jury then asked the trial court: "If we believe that the defendant was involved as an accomplice, but not one of the three who entered the house, can we find him guilty of the charges brought against him?" CP at 180. The trial court instructed the jury to "[r]efer to the instructions as given." CP at 180. Later that afternoon, the jury rendered its verdict.

The jury found Terrek Corbin guilty on three of six counts. The jury found Corbin guilty of: (1) first degree felony murder of Mark Wallace, (2) second degree assault of Brandon Wallace, and (3) first degree burglary based on the assault of Brandon Wallace. The jury found Corbin not guilty of: (4) attempted first degree robbery of Brandon

14

Wallace, (5) attempted first degree robbery of Corey Wallace; and (6) attempted first degree robbery of Tiffany Willy. The jury found by special verdict that Terrek Corbin was armed with a firearm when he committed the three crimes. On the murder charge, the jury found by special verdict that Corbin or an accomplice killed Mark Wallace in the course of or in furtherance of first degree burglary, not first degree robbery.

The trial court sentenced Terrek Corbin to fifty-eight and eight months of confinement.

## LAW AND ANALYSIS

On appeal, Terrek Corbin contends insufficient evidence supports his three convictions. Terrek Corbin argues that the jury convicted him only as an accomplice and the State failed to establish accomplice liability beyond a reasonable doubt. Corbin assumes and postulates that the jury convicted him as an accomplice, not a principal, because of the one jury question. Corbin contends that the phrasing of the question establishes that the jury did not believe he entered the Wallace residence on October 24, 2010, but jurors believed he was implicated in the murder for another reason. Presupposing the jury convicted Corbin as an accomplice who did not enter the Wallace home, Corbin argues that the State failed to connect Corbin's knowledge of the crime to its commission, failed to present evidence of an agreement between the three intruders, and failed to establish that Corbin participated in the assault of Brandon Wallace.

Terrek Corbin presupposes too much. The jury did not declare in its question that

it found Corbin to be absent at the time of the murder. The jury phrased its question by:

"*If* we believe that the defendant was involved as an accomplice, but not one of the three

who entered the house. . . ." CP at 180 (emphasis added). The jury's special verdict that

Terrek Corbin was armed with a gun at the time of the crime presupposes that the jury

concluded Corbin was present at the Wallace home.

Other reasons defy Terrek Corbin's assumption that the jury concluded he was not

present at the Wallace residence on the night of October 24. Any juror question could be

the query of only one juror. Even if the question came from the jury as a whole, the jury

continued to deliberate after the posing of a question and response by the trial court, and

the jury's collective mind could have changed regarding Corbin's presence at the crime

scene. In short, a jury question establishes nothing concerning the decision by the jury.

Case law rejects Terrek Corbin's reliance on a juror question. The decision of the

jury is contained exclusively in its verdict. *State v. Bockman*, 37 Wn. App. 474, 493, 682

P.2d 925 (1984). In *Bockman*, the jury asked, "If the defendants leave the scene of a

second degree burglary, then an assault occurred by a third party, are those two then

guilty by association of first degree burglary?" 37 Wn. App. at 493. Similar to this case,

the trial court told the jury, "You have received all of the Court's instructions."

*Bockman*, 37 Wn. App. at 493. The *Bockman* court held that the question sent to the

judge is not a final determination by the jury. 37 Wn. App. at 493. Only the final

verdicts contain the jury's decision.

16

Terrek Corbin's suppositions also belie the role of the jury and this court's standard of review. This court defers to the fact finder's determination of the persuasiveness of the evidence. *State v. Davis*, 176 Wn. App. 849, 861, 315 P.3d 1105 (2013), *rev'd on other grounds by* 182 Wn.2d 222, 340 P.3d 820 (2014). Jurors need not be unanimous as to the manner of an accomplice's and a principal's participation as long as all agree that each participated in the crime. *State v. Hoffman*, 116 Wn.2d 51, 104, 804 P.2d 577 (1991).

Evidence is sufficient if, after viewing it in the light most favorable to the State, a rational trier of fact could find each element of the crime beyond a reasonable doubt. *State v. Witherspoon*, 180 Wn.2d 875, 883, 329 P.3d 888 (2014); *State v. Green*, 94 Wn.2d 216, 221-22, 616 P.2d 628 (1980). A defendant challenging sufficiency of the evidence at trial admits the truth of the State's evidence and all reasonable inferences therefrom. *Witherspoon*, 180 Wn.2d at 883. A verdict may be supported by either circumstantial or direct evidence, as both may be equally reliable. *State v. Brooks*, 45 Wn. App. 824, 826, 727 P.2d 988 (1986).

A jury may draw inferences from evidence so long as those inferences are rationally related to the proven facts. *State v. Jackson*, 112 Wn.2d 867, 875, 774 P.2d 1211 (1989). A rational connection must exist between the initial fact proven and the further fact presumed. *Jackson*, 112 Wn. 2d at 875. An inference should not arise when other reasonable conclusions follow from the circumstances. *State v. Bencivenga*, 137

17

Wn.2d 703, 711, 974 P.2d 832 (1999). The jury may infer from one fact the existence of another essential to guilt, if reason and experience support the inference. *Tot v. United States*, 319 U.S. 463, 467, 63 S. Ct. 1241, 87 L. Ed. 1519 (1943).

The State presented sufficient evidence to convict Terrek Corbin of murder as a principal or accomplice. Based on direct or circumstantial evidence, the jury could conclude that Corbin wore his checkered black and white hooded jacket and a black bandana to the Wallace home the evening of October 24, 2010. Corbin wore gloves that night to avoid tainting the gun he used to kill Mark Wallace with fingerprints or DNA. Corbin was the first man of the three, whose jacket was brighter and bore a design. Corbin pistol-whipped Brandon Wallace and then shot Mark Wallace. Corbin ran from the shooting to somewhere familiar, the community center near his grandparents, to dispose of his clothing and the murder weapon. In a rush, Corbin also threw out his hat. He failed to bury the jacket, bandana, gun, or hat below the dumpster's extant trash. Corbin instead deposited the items inside the dumpster, shut the lid, and ran to Lydia Cardenas' home. On the morning of October 25, Corbin abandoned his few belongings and his girlfriend, child, and friends without a word to flee Yakima. Evidence of flight is probative as a circumstance in determining guilt or innocence. *State v. Etheridge*, 74 Wn.2d 102, 113, 443 P.2d 536 (1968).

The DNA on the hat connected Terrek Corbin to the remaining objects in the dumpster, including the gun. Corbin also contributed to the DNA on the black bandana

found within the jacket's pocket. Two of the three assailants wore such bandanas, both of whom were, like Terrek Corbin, Black. One of the bandana wearers shot Mark Wallace. Corbin admitted to formerly possessing the jacket found in the dumpster.

While Tiffany Willy and Brandon Wallace denied that the shooter's jacket was checkered, both identified only the shooter's clothing as bearing some kind of design. Given Tiffany's lack of glasses, the dim light, and the smell of recently burned marijuana, the evidence, in a light most favorable to the State, shows that Brandon and Tiffany Willy correctly assessed the shooter's clothing as uniquely bearing a pattern, but misidentified that pattern.

At the custodial interview, Detective Gonzalo Deloza did not mention a Halloween mask or gloves. Nonetheless, Corbin told the detective, "All those aside but all that other stuff, guns and *masks* or *gloves* or anything of that nature, I'm ah, I don't, know what I'm sayin'." Ex. 257 at 34 (emphasis added). This shows Corbin's knowledge of the crimes. In the jail calls, Corbin described himself as the "front liner" and "sacrificial person," and expressed concern that another might cooperate with police. Ex. 292 1-2. These calls, and Corbin's attempt to conceal them by using other inmates' pins, bolster the conclusion that Corbin led the attack on the Wallace home.

Terrek Corbin volunteered a DNA sample on the false belief the sample would exculpate him. In a jail call, Corbin confidently told a friend that police would not find additional evidence. When considered in tandem with Corbin's mention of gloves at the

19

No. 31433-2-III
*State v. Corbin*

custodial interview, this hubris shows that Corbin wore gloves to the Wallace home in order to prevent transferring fingerprints or DNA to the firearm he used to kill Mark Wallace. Evidence of concealment is material to and probative of guilt or innocence. *State v. Etheridge*, 74 Wn.2d at 113 (1968).

## CONCLUSION

We affirm Terrek Corbin's convictions for first degree felony murder, first degree burglary, and second degree assault. Sufficient evidence supports each conviction.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Fearing, J.

WE CONCUR:

Siddoway, C.J.

Lawrence-Berrey, J.

20